735 A.2d 1061

**John T. KLAUENBERG**

v.

**STATE of Maryland.**

**No. 7, Sept. Term, 1999.**

Court of Appeals of Maryland.

Aug. 25, 1999.

530

Robert Philip Thompson (Andrea K. Sugar, Thompson & Sugar, P.A., on brief), Baltimore, for petitioner.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and ROBERT L. KARWACKI (retired, specially assigned), JJ.

CATHELL, Judge.

In this case we are called upon to consider the admission of "bad acts" evidence and the applicability of Maryland Code (1982, 1994 Repl.Vol., 1998 Cum.Supp.), section 12–106 of the Health–General Article, in the context of a defendant's conviction for solicitation to commit the murder of the Honorable Joseph F. Murphy, Jr. We shall affirm the circuit court.

## I. Facts

Appellant John T. Klauenberg was found guilty by a jury in the Circuit Court for Baltimore City of solicitation to commit the murder of the Honorable Joseph F. Murphy, Jr. In bifurcated proceedings and pursuant to a stipulation between the defense and the State, the court entered a finding of Not Criminally Responsible.

The instant appeal is related to a prolonged civil estate matter between appellant and his sister, Elizabeth Francis. In 1984, Francis filed a lawsuit in the Circuit Court for Baltimore County against her brother with regard to what would be their father's estate,[1] worth approximately $1,700,-000. The litigation lasted for approximately eight years, until 1992. The matter was presided over primarily by Judge Murphy, then a circuit court judge and now the Chief Judge of the Court of Special Appeals. Judge Murphy, in his ultimate ruling, set aside as invalid various documents showing that appellant should receive all of his father's assets. Judge Murphy ordered, *inter alia*, that appellant and his sister would share equally in their father's assets. In addition,

---

1. The siblings' father, Theodore J. Klauenberg, died in April 1985, during the ongoing civil case.

appellant was sanctioned and ordered to pay the expenses associated with the litigation so that instead of receiving approximately $600,000, he received, after the sanction and costs, between approximately $170,000 and $200,000.

On April 28, 1992, appellant approached Reginald Palmer, who worked at Whiz Car Wash in Baltimore, and asked Palmer if he could "do murders and stuff." Palmer later testified that appellant discussed paying "three or five thousand dollars" for someone to kill "this lawyer . . . for killing a dog or a cat or something." Palmer initially did not take appellant seriously, but appellant approached Palmer again at the car wash the next day. On this occasion, Palmer told appellant that he "wasn't into that" and didn't know anybody who was. Palmer informed his boss, David Merrill, about this conversation and Merrill followed appellant to appellant's parked car, obtaining the tag number. Mr. Merrill then contacted the police with this information.

The police told Palmer to play along with appellant if he came back. On May 6, 1992, appellant approached Palmer for a third time, disclosing the name of the intended victim as Joseph Murphy, whom he wanted murdered near the University of Baltimore Law School by two shots in the head. After this conversation, appellant never approached Palmer again and did not pay him any money. At some point after contacting the police, Palmer positively identified appellant from a police photographic array. Appellant was arrested subsequent to a search of his vehicle and home on May 12, 1992.

To the charge of solicitation of murder, appellant entered a plea of not competent to stand trial, not guilty, and not criminally responsible. An evaluation was ordered and appellant was found incompetent to stand trial on December 11, 1992, by Judge Clifton J. Gordy. He was committed to the Department of Health and Mental Hygiene for inpatient care and treatment and thereafter admitted to the Clifton T. Perkins Hospital until he could be declared competent to stand trial.

On July 10, 1997, a hearing was held regarding appellant's competence. The next day, Judge Gordy signed an order finding appellant competent to stand trial. Bifurcated proceedings were held to determine appellant's guilt or innocence and criminal responsibility. A jury found him guilty of solicitation to commit murder. In the second proceeding, pursuant to a stipulation between the State and the defense, the court entered a finding of Not Criminally Responsible.

Appellant filed an appeal to the Court of Special Appeals and a Petition for Writ of Certiorari before this Court. We issued a Writ of Certiorari before the intermediate appellate court heard arguments. Appellant presents the following questions for review:

I. Did the trial court err in denying appellant's motion *in limine* seeking exclusion of prior bad acts of the appellant and in denying appellant's motion for mistrial?

II. Did the trial court err in denying appellant's motion to dismiss the indictment?

## II. Discussion and Analysis

### A. Motion *in Limine*

Appellant's first question relates to the trial court's denial of his motion *in limine*. Prior to the selection of the jury, appellant made an oral motion *in limine* to limit the scope of certain evidence to be presented by the State. He argued the State intended to question several witnesses about the civil case and that the evidence was not only irrelevant to the pending charge, but would highlight several bad acts by appellant that would serve only to prejudice the jury's perception of his character. The State, in turn, argued the testimony would not be evidence of bad acts, but would illuminate for the jury the context of the crime for which appellant was charged and his motive to commit the crime.

In support of his claim that the trial court abused its discretion in denying his motion *in limine,* appellant refers in his brief to several instances in which he says the trial court allowed the admission of bad acts evidence through the testi-

mony of three witnesses: Daniel Twomey, the lawyer who represented Elizabeth Francis in the estate case; Elizabeth Francis; and Gerald Ruter, the lawyer appointed by Judge Murphy in the civil case as a special auditor. Before discussing the pertinent rules for the admission of bad acts, we shall set forth the evidence appellant deems was improperly admitted.

## 1. Testimony of Daniel Twomey

We shall restate verbatim appellant's arguments to this Court and then rephrase those issues to ensure clarity:

The [S]tate initially had Twomey testify as to the nature of the civil case between [a]ppellant and his sister. Witness Twomey also testified that Judge Joseph Murphy was the presiding judge at the civil trial. The prosecution then inquired from Mr. Twomey as to the [a]ppellant's conduct toward Judge Murphy during [the civil estate] trial from 1985 to 1992. Appellant's trial counsel objected but said objection was overruled. Twomey informed the jury that his observation of [appellant] in the court room was one of a very angry person which was consistent with the way he had been acting in his presence before the trial. Twomey further testified that [appellant] was not only angry but was also physically intimidating in the sense of body posture, glaring, tone of voice, and comments from the counsel table where he was sitting. He also stated that at one part in the proceedings, the Judge had to admonish [a]ppellant, extremely sternly, to control himself, stop his outbursts and to remain in his chair. Twomey went on to describe [appellant] as confrontational. He also made reference to having been in [appellant]'s house with a police officer with [appellant] being very close in his face, pounding on his chest, poking on his chest with his index finger, and being informed by the police officer to back-off. Twomey was also asked about any weapons the [a]ppellant had in his house. Over the objection of defense counsel, Twomey was allowed to testify that he found two (2) pistols in [appellant]'s house, one being a .38 revolver. Twomey also told the jury that

[a]ppellant stood without moving in one place in his house and then informed the jury that fortunately, the police were literally right next to him, surrounding [a]ppellant as he went through this exercise. Twomey then testified that on a subsequent occasion, he went into [appellant]'s house and a .22 semi-automatic pistol was found along with 600 rounds of ammunition.

The prosecutor also had Twomey describe the interior of [a]ppellant's home. Twomey responded by indicating that he couldn't walk on the floor in [a]ppellant's house since it was piled waist-high with paper. Twomey described the interior of [appellant]'s home as being similar to a yard that's overgrown and animals run through their pathway with people walking.

We rephrase the testimony by Twomey that appellant perceives as objectionable into related topics or the single question from which the testimony arose, as it appeared in the trial transcript:

a. Appellant objected to the State's question about the nature of the civil estate case. The court overruled this objection.

b. Appellant argues in his brief that "[w]itness Twomey also testified that Judge Joseph Murphy was the presiding judge at the civil trial." Appellant did not object to the State's question or Twomey's answer at trial.

c. Appellant objected at trial to the question, "How was his conduct toward Judge Murphy during his trial from 1985 to 1992?" The grounds stated were, "It's too broad, Your Honor." The court overruled this objection and the witness proceeded to describe appellant's conduct in the courtroom.

d. While describing appellant's courtroom conduct, the witness stated that appellant was "confrontational," to which appellant objected. The court overruled this objection and the witness went on to describe the state of disarray in appellant's home.

e. Twomey began describing appellant's aggressive conduct toward him, and appellant objected. This objection was overruled and the witness continued testifying to a specific confrontation.

f. The State asked the witness, "What, if any, weapons did the defendant keep at his house?" Appellant objected, but the court overruled the objection and the witness testified that two guns and 600 rounds of ammunition were found in appellant's home. As part of his answer about appellant's guns, the witness also testified that appellant "stood without moving while people went into other rooms in the basement," noting that the police stood near appellant as he did this.

### 2. Testimony of Elizabeth Francis

With regard to certain testimony of appellant's sister, Elizabeth Francis, appellant argued the following in his brief:

> The prosecution then solicited more bad character evidence from [a]ppellant's sister, Betty Francis, over the objection of defense counsel. Witness Francis told the jury that she had filed a constructive trust case against the [a]ppellant because she was having some difficulty with the way he was abusing her father. Defense counsel's objection and motion to strike this testimony was sustained but obviously it could not be erased from the minds of the jurors. The prosecution then inquired from Francis as to how long it had been since she and the [a]ppellant were on talking terms. Witness Francis responded, "The last time when he beat me up." While once again defense counsel objected, and had the testimony stricken, it is inconceivable that the prosecution did not anticipate the answer to this question which obviously was done to further the prosecution's portrayal of the [a]ppellant as a bad, violent person who should be convicted or deserved punishment for other bad conduct. Ms. Francis, in responding to the prosecution's questions, indicated that [a]ppellant was prohibited from going to her home or place of employment by virtue of a court order.

We summarize appellant's contentions on appeal in the following manner:

a. Appellant timely objected to Francis' testimony about appellant's abuse of their father. The court sustained the objection.

b. Appellant timely objected to Francis' testimony about appellant's abuse toward her. The court sustained the objection, specifically striking the testimony.

c. The State asked the witness what she did concerning appellant's knowledge of where she lived. Appellant objected, but was overruled. The witness responded that she had obtained a court order to prevent him from entering her premises.

### 3. Testimony of Gerald Ruter

As with the other two witnesses, we shall restate and then summarize the objectionable testimony of Gerald Ruter as described by appellant in his brief:

> The prosecution then called Gerald Ruter, Esquire. After a few brief inquiries from Cohen to witness Ruter regarding Ruter's role in the case, the prosecution immediately directed an inquiry as to whether Ruter encountered any difficulties in performing his job as an auditor. Ruter testified that he attempted to enter [appellant]'s home and was denied access. He testified that he had to get a court order which was signed by Judge Murphy to permit access to the premises. He also testified regarding outbursts in court allegedly made by [a]ppellant in the civil proceedings and that it was his belief that these outbursts were incoherent and made no particular sense, were not rational and had nothing to do with the issues before the court.
>
> Ruter's testimony was similar to that of Francis and Twomey in that the testimony was not probative of any issue before the criminal trial jury but pertained exclusively to their perception of [a]ppellant and his bad conduct. Ruter was also allowed to testify that [a]ppellant had come

to his home uninvited at some time during the civil proceedings.

We summarize appellant's relevant objections:

a. The State asked Ruter if he had any problems performing his job, and he described several problems, including the need to obtain a court order to get access to appellant's home. Appellant's only objection to this line of questioning was that certain testimony would be cumulative.

b. The State asked the witness specifically whether the defendant made any outbursts in court, to which the witness responded in the affirmative. Appellant at no time objected to the answer or question.

c. On recross examination, the appellant asked the State's witness whether appellant ever came to the witness' house when the witness did not want him to. The witness responded that he had. Appellant did not object at trial to the witness' answer.

### 4. Issues Not Preserved for Appellate Review

As a preliminary matter, we note that pursuant to Maryland Rule 4-323(a), "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." In addition, we recently have reaffirmed that when a motion *in limine* to exclude evidence is denied, the issue of the admissibility of the evidence that was the subject of the motion is not preserved for appellate review unless a contemporaneous objection is made at the time the evidence is later introduced at trial. *See Reed v. State*, 353 Md. 628, 638, 728 A.2d 195, 200–01 (1999). *See also Watson v. State*, 311 Md. 370, 372–73 n. 1, 535 A.2d 455, 457 n. 1 (1988) ("[W]hen a trial judge makes a final ruling on a motion *in limine* to admit evidence, the party opposing the admission of the evidence must subsequently object at trial when the evidence is offered to preserve his objection for appeal."); *Proud v. State*, 311 Md. 348, 356, 535 A.2d 445, 449 (1988) ("Obviously, the trial judge may either grant or deny

the motion [*in limine*]. If the trial judge admits the questionable evidence, the party who made the motion ordinarily must object at the time the evidence is actually offered to preserve his objection for appellate review.").

██ Appellant waived several of the issues he presents to this Court because he failed to make timely or appropriate objections. With regard to witness Twomey, the trial transcript indicates that appellant failed to object to the State's question or the witness' answer as to the identity of the judge who presided over the civil case:

[By the State]: And the Court, who was the judge who made the ruling in this case?

[By Mr. Twomey]: It is the Judge Joseph Murphy, Circuit Court, Baltimore County.

This issue, therefore, is waived.

██ Appellant also asserts that the State's question to Twomey about appellant's conduct during the trial was improper evidence of appellant's bad conduct. In reviewing the transcript, however, it is clear that appellant objected only to the form of this question, not its content:

Q: How was the defendant's conduct during the trial?

[By Defense Counsel]: Objection.

THE COURT: Overruled.

A: The defendant's conduct during the trial—

[By Defense Counsel]: Your Honor, I object again on time, they said this went on years. I don't know when we are talking about.

THE COURT: Okay. Would you like to give us a time limit, sir[?]

[By the State]: Excuse me, Your Honor.

THE COURT: Go ahead.

[By the State]:

Q: How was his conduct toward Judge Murphy during this trial from 1985 to 1992?

[By Defense Counsel]: Objection. It's too broad, Your Honor.

THE COURT: Overruled.

It is well-settled that when specific grounds are given at trial for an objection, the party objecting will be held to those grounds and ordinarily waives any grounds not specified that are later raised on appeal. *See, e.g., United States Gypsum Co. v. Mayor of Baltimore,* 336 Md. 145, 175, 647 A.2d 405, 419 (1994); *Thomas v. State,* 301 Md. 294, 328, 483 A.2d 6, 23 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985); *Anderson v. Litzenberg,* 115 Md.App. 549, 569, 694 A.2d 150, 160 (1997). Because he clarified the nature of his objection as to the broadness of the question and not as to the content, namely, that testimony about appellant's conduct during the civil trial was bad acts evidence, appellant failed to preserve this issue for review.

■ Similarly, appellant waived any objection as to bad acts evidence with respect to Twomey's testimony that appellant became confrontational. Appellant objected only on the general ground of relevancy. The transcript reflects that the prosecutor asked Twomey to describe appellant's conduct toward Judge Murphy. Twomey expanded his answer and began describing appellant's conduct outside of the courtroom:

[By Twomey]: ... During that time, his demeanor was equal to his demeanor in the courtroom, and at certain times during going to the house, collecting financial records, it became more confrontational.

[By Defense Counsel]: Your Honor, I'm going to object, unless Judge Murphy was there, I don't see any relevance.

THE COURT: Overruled. What do you mean by confrontational, sir?

As is evident, appellant specifically objected to this testimony as irrelevant. In addition to the cases holding that when the objecting party states his or her ground for objection at trial he or she normally is limited to those grounds on appeal, *see, e.g., United States Gypsum,* 336 Md. at 175, 647 A.2d at 419; *Thomas,* 301 Md. at 328, 483 A.2d at 23; *Anderson,* 115

Md.App. at 569, 694 A.2d at 160, the Court of Special Appeals in *Jeffries v. State,* 113 Md.App. 322, 341, 688 A.2d 16, 25, *cert. denied,* 345 Md. 457, 693 A.2d 355 (1997), held specifically that a party who objected to testimony at trial only as to general relevance could not argue for the first time on appeal that the testimony was inadmissible evidence of other bad acts.

Also connected with this same line of testimony is appellant's argument that the court abused its discretion in allowing Twomey to testify as to the uncleanliness of appellant's home. A review of the transcript reveals that appellant waived this issue because he failed to object. As we have indicated, the prosecutor questioned Twomey about appellant's conduct toward Judge Murphy. After appellant objected to the irrelevance of Twomey's depiction of appellant being confrontational, Twomey began to recount an incident that occurred while he was in appellant's home, first describing how the home looked inside:

> [By Twomey]: Specifically, there was one event and to paint the scene, we were in the living room. The room was, you couldn't get to the floor, stand on the floor. We were walking on top of where it had been packed down where much like in your mind's eye, where if you are in a yard that's overgrown and animals run through their pathways with people walking. We are in a room where paper had been piled as high as approximately my waist, but where the occupants had walked. There were beaten down paths that I would say that the paper at points was compressed down to no less than six to eight inches and then around it was kind of piled up.

Twomey then went on to describe a physical confrontation between him and appellant. At no time during Twomey's depiction of appellant's home did appellant raise any objection. Accordingly, the issue is not preserved.

Regarding witness Ruter, appellant failed to object when the State asked Ruter if he had any problems in completing his job and inquired about Ruter's need for a court order:

Q: And when you attempted to [determine the parties' and their father's assets], did you encounter any difficulty?

A: Yes, sir.

. . . .

Q: How would you characterize your dealings with the defendant?

A: They were difficult in that [appellant] and I didn't seem to communicate well. . . .

Q: Did you encounter any difficulty when you tried to determine these assets such as when you went to—did you have to go to his home in Kingsville?

A: Ultimately I did do that, sir. . . . [T]here did come a time when I requested access to his property which he denied me. . . .

Q: What happened when you were denied access?

A: I had to seek a court order from the Circuit Court judge in this case, Judge Joseph Murphy[,] to permit me access to the home.

The witness went on to testify that he needed police assistance to gain access to appellant's home. Appellant did not object to any of the State's questions or the witness' answers. Given appellant's failure to object, the issue is waived.

Appellant also argues Ruter's testimony as to appellant's outbursts in court should not have been admitted. Appellant did not object to this question or answer:

Q: Did you notice, were there any time [appellant] made any outbursts or anything unusual in court during the time?

A: Yes, sir.

Q: Can you describe that?

A: I have to say, Mr. Cohen that there were, each court appearance there were outbursts.

The witness went on to explain that he believed the outbursts were aimed sometimes at him, sometimes at Judge Murphy, and sometimes at the lawyers. Because appellant failed to object during this line of questioning, the issue is waived.

■ Finally, appellant argues that Ruter erroneously was permitted to testify that he came to Ruter's house uninvited. The question at issue, however, was asked *by* appellant to the State's witness on recross examination. Because appellant invited the error of this testimony and did not object to the answer given by Ruter, this issue also is waived. *See Allen v. State,* 89 Md.App. 25, 43, 597 A.2d 489, 498 (1991) (" 'Invited error' is the shorthand term for the concept that a defendant who himself invites or creates error cannot obtain a benefit— mistrial or reversal—from that error."), *cert. denied,* 325 Md. 396, 601 A.2d 129 (1992); *see also, e.g., United States v. Taylor,* 508 F.2d 761, 763 (5th Cir.1975) ("Sometimes called the doctrine of invited error, the accepted rule is that where the injection of allegedly inadmissible evidence is attributable directly to the action of the defense, its introduction does not constitute reversible error."); *McCall v. State,* 501 So.2d 496, 499 (Ala.Crim.App.1986) ("Error cannot be predicated upon the admission of a statement introduced and put in the record by the defendant himself."); *Sanville v. State,* 593 P.2d 1340, 1344 (Wyo.1979) ("A reviewing court is not receptive to the idea of reversals where error is invited.").

■ Appellant argues the trial court abused its discretion in allowing Francis to testify that she had obtained a court order to prevent appellant from entering her premises. Appellant timely objected to this testimony at trial. Later in the trial, however, the State questioned Judge Murphy during redirect examination about that court order, which he had granted in the civil case:

Q: And the Defense asked you about the order you passed concerning Congressman Bentley, Congressman Cardin, Mrs. Francis. Could you read State's Exhibit 19 for identification. Tell us what that order said?

Judge Murphy then read the order verbatim and aloud. Appellant's only objection came after the order was read and when the State attempted to introduce the written order as evidence. Appellant stated: "Objection, it's been read." The trial court received the exhibit and overruled appellant's ob-

jection. As we stated above, it is fundamental that a party opposing the admission of evidence must object at the time that evidence is offered. *See* Md. Rule 4–323(a). This also requires the party opposing the admission of evidence to object each time the evidence is offered by its proponent. *See Tichnell v. State,* 287 Md. 695, 716, 415 A.2d 830, 841 (1980) ("[I]t is not reversible error when evidence, claimed to be inadmissible, is later admitted without objection."); *see also Jones v. State,* 310 Md. 569, 588–89, 530 A.2d 743, 753 (1987) (holding that no prejudice occurred when certain evidence was admitted at one point without objection and at another point over an objection), *vacated on other grounds,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988); *Clark v. State,* 97 Md.App. 381, 394–95, 629 A.2d 1322, 1329 (1993) (holding that even though the defense objected to certain testimony, failure to object again to the State's subsequent elicitation of the same testimony waived objection for appeal). Accordingly, because appellant failed to object when Judge Murphy read the order in its entirety into the record, he waived the objection for appeal.

### 5. Appeal from Objections Sustained by Trial Court

Appellant complains that although his objections were sustained and the testimony stricken, Francis' testimony that appellant had beaten their father and had beaten her "obviously ... could not be erased from the minds of the jurors." Appellant asked the trial court for no other remedy. Because he received the remedy for which he asked, appellant has no grounds for appeal. The Court of Special Appeals addressed a similar issue in *Ball v. State,* 57 Md.App. 338, 358–59, 470 A.2d 361, 372 (1984), *aff'd in part and rev'd in part on other grounds by Wright v. State,* 307 Md. 552, 515 A.2d 1157 (1986). In *Ball,* the defendant claimed he was denied a fair trial because of the nature of some of the prosecutor's closing arguments. The defendant had objected to the comments and the trial court sustained the objection; however, the defendant requested no other relief. Holding

the trial court did not err, the intermediate appellate court stated:

> The appellant Ball did not ask for a curative instruction. The appellant Ball did not move for a mistrial. It would certainly have been the height of irresponsibility for the trial judge to have declared a mistrial *sua sponte*, whether the appellant wanted one or not.... In a nutshell, the appellant Ball got everything he asked for. This is not error.

*Id.* (citation omitted). *See also Blandon v. State,* 60 Md.App. 582, 586, 483 A.2d 1320, 1322 (1984), *aff'd,* 304 Md. 316, 498 A.2d 1195 (1985). In any event, the trial court in the case *sub judice* gave specific instructions to the jury that

> [i]nadmissible or stricken evidence mustn't be considered or used by you. You have to disregard questions that I didn't permit the witness to answer, and you must not speculate, you must not speculate as to the possible answers. And if after an answer was given I ruled that the answer should be stricken, please disregard it.

Accordingly, there was no error.

### 6. Bad Acts Evidence

■ Having disposed of the waived issues, we now turn to appellant's contention that the trial court abused its discretion in denying his motion *in limine* because the testimony the State elicited was evidence of bad acts and, therefore, inadmissible. Maryland Rule 5–404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

Although our cases have explored the proper analysis to be invoked when a party seeks to admit evidence of other crimes, wrongs, or acts, *see, e.g., Streater v. State,* 352 Md. 800, 807–10, 724 A.2d 111, 114–16 (1999); *Whittlesey v. State,* 340 Md.

30, 58–59, 665 A.2d 223, 237 (1995), *cert. denied,* 516 U.S. 1148, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996); *Ayers v. State,* 335 Md. 602, 633–35, 645 A.2d 22, 36–38 (1994), *cert. denied,* 513 U.S. 1130, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995); *Harris v. State,* 324 Md. 490, 496–98, 597 A.2d 956, 960–61 (1991); *State v. Faulkner,* 314 Md. 630, 634–35, 552 A.2d 896, 897–98 (1989), we never have had occasion to discuss what constitutes a wrong or act under this rule. As noted in the Commentary to Federal Rule of Evidence 404, the "wrongs or acts" are often referred to by courts as "uncharged misconduct" or "bad acts."[2] For purposes of our discussion, we shall use the phrase "bad acts."[3]

The most obvious reason for not defining "bad acts" is that many acts, in and of themselves, are not "bad." An act prohibited by the criminal code but which goes uncharged is perhaps easy to identify as a bad act, hence the term "uncharged misconduct." Other acts have the connotation of being bad, but until placed in the context of the lawsuit, cannot be said to be bad or good. For instance, this Court has said that although mere possession of a knife and walking behind a woman are not crimes, under certain circumstances, "these acts could be construed as misconduct." *Whittlesey,* 340 Md. at 58, 665 A.2d at 237. A criminal defendant's plan to flee in order to evade prosecution, we held, also could be construed as a bad act. *Id.* at 63, 665 A.2d at 239. Conversely, even though solicitation of prostitution is a crime in this

---

**2.** The commentators to the Maryland Rules note that Maryland Rule 5–404 was derived from Federal Rule of Evidence 404.

**3.** Many courts refer to the acts in this rule as "prior bad acts." This nomenclature is not precise, however, as the acts contemplated by the rule need not be "prior"; they can be acts subsequent to the event that is the subject of the lawsuit. What is more, the acts need not be bad. The rule states that "[e]vidence of other crimes, wrongs, or acts" are not admissible to prove character. The rule does not specify that the acts must be "bad." A "good" act may be just as relative and probative to prove, for instance, a defendant's motive as a bad act. *See, e.g., Wall v. State,* 269 Ga. 506, 508, 500 S.E.2d 904, 907 (1998) (holding that evidence of the relationship between the defendant and the victim may be admissible to show the defendant's motive or intent in committing the offense).

state, a defendant's statement that he "got a girl and had sex," without any indication that the girl was a prostitute or an unwilling partner, did not necessarily constitute a crime or a bad act. *See Burch v. State*, 346 Md. 253, 270–71, 696 A.2d 443, 452, *cert. denied,* —— U.S. ——, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997).

Other jurisdictions have had equally varied results. For instance, membership in a gang was considered a bad act in *United States v. Robinson*, 978 F.2d 1554, 1562–63 (10th Cir.1992), *cert. denied,* 507 U.S. 1034, 113 S.Ct. 1855, 123 L.Ed.2d 478 (1993),[4] and *Hoops v. State*, 681 So.2d 521, 530 (Miss.1996). Threats made to the victim were considered bad acts and relevant to motive in *Pye v. State*, 269 Ga. 779, 784, 505 S.E.2d 4, 11 (1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1767, 143 L.Ed.2d 797 (1999) and *Wall v. State*, 269 Ga. 506, 509, 500 S.E.2d 904, 907 (1998). Similarly, an insurance fraud scheme was a bad act admissible to prove motive in *State v. Benn*, 120 Wash.2d 631, 654–55, 845 P.2d 289, 302–03, *cert. denied,* 510 U.S. 944, 114 S.Ct. 382, 126 L.Ed.2d 331 (1993). A criminal defendant's admission in a murder case that he had problems in the past with bank accounts, however, "did not rise to the level of [bad acts] evidence." *Green v. State*, 587 N.E.2d 1314, 1317 (Ind.1992). A bankruptcy filing, under the circumstances of that case, was held not to fall within the scope of Federal Rule of Evidence 404(b) in *United States v. McMillon*, 14 F.3d 948, 955 (4th Cir.1994). The Arizona Supreme Court stated in *State v. Crane*, 166 Ariz. 3, 7, 799 P.2d 1380, 1384 (Ariz.1990), that a letter detailing the defendant's sexual history with his wife did not fall under the other bad acts rule because consensual sexual conduct with one's wife is not a bad act. Finally, the Supreme Court of Delaware stated in *Gattis v. State*, 637 A.2d 808, 818–19 (Del.), *cert. denied,* 513 U.S. 843, 115 S.Ct. 132, 130 L.Ed.2d 75 (1994), that even though it was relevant as background, testimony

---

4. The original case involved three codefendants. All three were denied a writ of certiorari. *See Meekes v. United States,* 508 U.S. 963, 113 S.Ct. 2938, 124 L.Ed.2d 687 (1993); *Jackson v. United States,* 507 U.S. 1034, 113 S.Ct. 1855, 123 L.Ed.2d 478 (1993).

that the defendant followed the victim to her apartment was not a bad act because "the act of following the victim . . . does not constitute misconduct[ ] or a bad act."

Other courts have had the opportunity to articulate a threshold useful in determining whether the conduct at issue is a bad act. For example, the court in *McMillon,* 14 F.3d at 955, said that " 'an act need not be criminal, so long as it tends to impugn a defendant's character.' " (quoting *United States v. Rawle,* 845 F.2d 1244, 1247 (4th Cir.1988)). In *United States v. Cooper,* 577 F.2d 1079, 1087–88 (6th Cir.), *cert. denied,* 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978), the court, first noting that "[t]he application of Rule 404(b) is as varied as the cases in which it may be invoked," stated: "Conceivably within the broad language of the rule is any conduct of the defendant which may bear adversely on the jury's judgment of his character." The Supreme Court of Indiana, noting that a bad act typically was "evidence of a defendant's extrinsic activity which reflects adversely on his character," held evidence that the defendant videotaped the young victim's baseball game, allegedly attended a neighborhood Bible study with the child, and took the child fishing were not bad acts because those activities, by themselves, did not illustrate any "unsavory character trait with which [the defendant] could have acted in conformity" in regard to the victim's murder. *Stevens v. State,* 691 N.E.2d 412, 423 (Ind.), *cert. denied,* —— U.S. ——, 119 S.Ct. 550, 142 L.Ed.2d 457 (1998).

In reviewing the holdings from other jurisdictions and examples of what those courts have construed or not construed as bad acts, the general theme running through each is that a bad act is an activity or conduct, not necessarily criminal, that tends to impugn or reflect adversely upon one's character, taking into consideration the facts of the underlying lawsuit. It is from this general proposition that we evaluate whether the evidence to which appellant protests as erroneously admitted were bad acts under Maryland Rule 5–404(b).

■ As we indicated, *supra,* appellant challenges witness Twomey's testimony about the nature of the civil estate case. The following occurred at trial:

Q: And during this time, this eight years or so that this litigation, we don't want to get into all the details, but what was the crux of [the] basis for the suit?

[By Defense Counsel]: Objection.

THE COURT: Overruled.

We fail to see, and appellant offers no argument other than to baldly state that Twomey testified to the nature of the civil case, how Twomey's testimony demonstrates conduct by appellant that would tend to impugn his character. The fact that appellant was involved in an underlying suit would not shade a jury's view of appellant as a bad person; the witness simply was explaining how he was involved in the case and what the case concerned. Under the circumstances of this case, the nature of the underlying estate case is not a bad act as contemplated by Rule 5–404(b).

 The prosecutor later asked Twomey about any guns appellant kept at his house. Appellant gave a general objection, which the court overruled. While responding to this question, Twomey described appellant's peculiar conduct while Twomey, accompanied by the police, were searching the home for certain documents. Apparently, appellant usually followed Twomey around the house, but Twomey explained that "[t]here was one place [appellant] stood without moving while people went into other rooms in the basement, and fortunately the police were literally right next to him, surrounding him as he went through this exercise." Twomey went on to testify that he was curious why appellant stood in that one location. He later discovered that there was a gun stored in the ceiling tiles above the area in which appellant stood still. As related to the prosecutor's question about the guns, the issue was preserved.

We do not believe that Twomey's testimony about appellant standing in one spot described a bad act. To be sure, the fact that the police stood near appellant while he was acting peculiarly imparts a general impression that they feared appellant might act out. But there is no indication that he did. Standing in place without moving, which is the supposed bad

act appellant argues should not have been disclosed to the jury, does not impugn his character. Standing and watching while one's house is being searched is probably a common reaction. Therefore, because this conduct to which Twomey testified is not a bad act, the court did not abuse its discretion in admitting it.

The only two remaining incidents that appellant avers were improperly admitted evidence of bad acts are appellant's conduct toward Twomey and appellant's possession of two guns and ammunition. We are not convinced that either should be considered bad acts for purposes of Rule 5–404(b). Regarding appellant's conduct toward Twomey, who was the opposing attorney in the civil lawsuit, Twomey testified about how appellant became verbally confrontational and poked Twomey in the chest. Raising one's voice and poking someone in the chest alone is not conduct that tends to impugn someone's character.

Similarly, Twomey's testimony that two guns and ammunition were found on appellant's premises, without more, does not constitute a bad act. The Court of Special Appeals noted as much in *Wheeler v. State*, 88 Md.App. 512, 527 n. 10, 596 A.2d 78, 86 n. 10 (1991). There was no indication that these firearms were obtained or possessed illegally. No evidence was offered at trial that appellant's guns were to be used in the murder. Therefore, under the circumstances of this case, the evidence of appellant's conduct toward Twomey and the evidence of the guns were not bad acts.

### B. Motion for Mistrial

Appellant appears to argue that the trial court abused its discretion in denying his motion for mistrial. The motion related to testimony by Ruter that described threats made to him by appellant. We shall affirm the trial court for three reasons. First, appellant waived the issue because he failed to present an argument in his brief. Second, appellant waived the issue because the transcript reflects that he objected on grounds differing from the grounds that we perceive he now

attempts to argue before this Court. Finally, given the broad discretion of the trial court to grant or deny a motion for mistrial and the deference we afford trial courts as to that determination, the trial court did not abuse its discretion in denying appellant's motion for mistrial.

■■■ Maryland Rule 8–504(a)(5) provides that an appellate brief shall contain "[a]rgument in support of the party's position." The Court may dismiss an appeal "or make any other appropriate order with respect to the case" for a party's failure to comply with the rule. Md. Rule 8–504(c). Appellant, in his brief, states the following: "Ruter was also allowed to testify that [a]ppellant had come to his home uninvited at some time during the civil proceedings. Ruter testified that he had been threatened by [appellant] in response to one of the prosecutor's leading questions." After quoting a brief excerpt from the transcript, appellant baldly states: "Defense counsel made a motion for a mistrial based on Ruter's testimony which was denied by the court." Appellant proffers no argument as to why the trial court abused its discretion in denying the motion for mistrial. Because it is lumped in with his argument relating to the trial court's failure to exclude the evidence of other bad acts, we might assume that appellant is arguing the trial court abused its discretion in denying the motion for mistrial because it was improper evidence of other bad acts. It is not our duty, however, to make such a speculation. As the Court of Special Appeals has held, arguments not presented in a brief or not presented with particularity will not be considered on appeal. *Broadcast Equities, Inc. v. Montgomery County,* 123 Md.App. 363, 390, 718 A.2d 648, 661, *cert. granted,* 352 Md. 305, 721 A.2d 712 (1998). Accordingly, this issue is waived.

■■■ Had we speculated that appellant is arguing the trial court abused its discretion because Ruter's testimony was evidence of other bad acts, we likewise would affirm the trial court. The passage to which appellant refers, which we now restate more completely, reflects that the following occurred at trial:

[By the State]: Well, were you only comfortable with a meeting specially at his house when you had to get the police?

[By the Defense]: Objection.

THE COURT: Sustained.

[By the State]: Were there any time that you had concerns?

[By the Defense]: Objection.

THE COURT: I'll sustain as to the form of the question.

[By the State]: What, if any, concerns did you have regarding dealing with the defendant?

A: I called the police on one occasion.

Q: Why did you call the police, sir?

[By the Defense]: Objection.

THE COURT: Overruled.

A: He had made threats to me personally and he knew where I lived, so I was concerned about that, and I called the police department, and they came to my home, and we had a discussion about the whole matter, what was going on and the like.

[By the State]: What type of threat did the defendant make to you?

[By Defense]: Objection.

THE COURT: Overruled.

A: He threatened, such as burning my house down, or you know, be careful around your house, it was that kind of threat.

[By the State]: It was a threat enough for you to call the police; is that right?

A: Yes.

Q: Why did you call the police, were you really concerned that it was a threat to the safety of you and your family?

A: Yes, I'm not a skittish person at all, Mr. Cohen, and I was so used to hearing [appellant] make those comments,

that I didn't worry about it at first, and then when he knew where I lived and I knew that he knew where I lived, and when he referenced my home, I figured, I may not be very smart, if I don't at least let the police department know that such a comment was made to me.

[By the State]: Thank you, sir. I have no questions.

After the defense recross examined Ruter, counsel approached the bench. Appellant's counsel moved for a mistrial and the following transpired:

[By the Defense]: On the cross examination of Mr. Ruter, I carefully avoided any threat as far as Mr. Ruter was concerned. There had been no threats or mention of threats during the State's direct. I knew about the one threat that [Mr. Ruter] referred to.

. . . .

*And State did not ask anything about that in direct examination. I carefully avoided it in cross examination. Then the State came back. I objected. I think that created a very, very, very unfair prejudicial situation when the evidence came out about a threat.* And reluctantly I have to ask for a mistrial.

THE COURT: Wait a minute. You objected when he asked about a threat?

. . . .

[By the Defense]: Yes, redirect, Mr. Cohen came back and said how did he feel comfortable with him. I think I did not object to that. Then there were any specific threats, and I objected.

. . . .

I just think that creates an environment where he can't possibly have a fair trial.

. . . .

THE COURT: Okay. The court denies your motion for mistrial, sir. Thank you. [Emphasis added.]

█ It appears from the trial transcript that appellant moved for mistrial on the ground that the State went beyond

the scope of the cross examination when questioning Ruter on redirect. Although appellant objected generally during redirect, by specifying his ground for mistrial as beyond the scope of the cross examination, he waived any argument that the court abused its discretion in denying the motion for mistrial on the ground that the witness improperly testified as to appellant's bad acts because, by stating his ground for the motion for mistrial to the court, he is limited to that ground on appeal.

In any event, we affirm the trial court's denial of appellant's motion for mistrial for a third reason. As this Court has stated time and again, the decision of whether to grant a motion for a mistrial is within the sound discretion of the trial court. *See, e.g., Hunt v. State*, 321 Md. 387, 422, 583 A.2d 218, 235 (1990), *cert. denied*, 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991); *State v. Hawkins*, 326 Md. 270, 277, 604 A.2d 489, 493 (1992); *White v. State*, 300 Md. 719, 737, 481 A.2d 201, 210 (1984), *cert. denied*, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 837 (1985); *Wilhelm v. State*, 272 Md. 404, 429, 326 A.2d 707, 723 (1974). The grant of a mistrial is considered an extraordinary remedy and should be granted only "if necessary to serve the ends of justice." *Hunt*, 321 Md. at 422, 583 A.2d at 235 (quoting *Jones*, 310 Md. at 587, 530 A.2d at 752). Our review on appeal is limited to whether the trial court abused its discretion in denying the motion for mistrial. *White*, 300 Md. at 737, 481 A.2d at 210; *Wilhelm*, 272 Md. at 429, 326 A.2d at 723; *Hawkins*, 326 Md. at 277, 604 A.2d at 493. Accordingly, a reviewing court will not reverse the trial court unless the defendant clearly was prejudiced by the trial court's abuse of discretion. *Hunt*, 321 Md. at 422, 583 A.2d at 235.

The trial court did not abuse its discretion in denying appellant's motion for mistrial. We find it doubtful that the remarks by Ruter prejudiced appellant. Several other witnesses testified to appellant's anger and aggression while the civil trial took place. All of these witnesses' comments were admitted properly to illuminate for the jury appellant's motive

in soliciting the murder of Judge Murphy, and Ruter's testimony was no exception. That the testimony was hurtful to appellant's case does not alone warrant reversal. Accordingly, we affirm the trial court.

## C. Motion to Dismiss

We turn now to appellant's argument that the trial court abused its discretion in denying his motion to dismiss the indictment. Appellant was arrested on May 12, 1992. On August 6, 1992, the circuit court signed an order requiring that appellant be examined as to competency and responsibility. The court signed a Finding of Incompetency and Order of Commitment on December 11, 1992, declaring appellant incompetent to stand trial and committing him to the Department of Health and Mental Hygiene for treatment until he was competent to stand trial. On July 10, 1997, after a hearing, appellant was found competent to stand trial and a trial date was set. The trial judge in this case performed a second in-court competency hearing. On April 22, 1998, appellant's counsel orally moved to dismiss the indictment. The trial court denied this motion.

The crux of appellant's argument is that the trial court should have dismissed his indictment pursuant to Maryland Code (1982, 1994 Repl.Vol., 1998 Cum.Supp.), section 12–106(a)(2)(ii) of the Health–General Article, which provides that

if the court considers that resuming the criminal proceeding would be unjust because so much time has passed since the defendant was found incompetent to stand trial, the court may dismiss the charge. However, the court may not dismiss a charge ... [u]ntil 5 years after the defendant was found incompetent to stand trial in any other case where the penalty may be imprisonment in the State penitentiary.

Appellant also argues in his brief that the trial court abused its discretion in not dismissing the indictment because his Sixth Amendment right to a speedy trial was violated.

We shall dispose of appellant's speedy trial argument first. Any speedy trial argument appellant may have had is

waived because he raises this issue for the first time on appeal. Although appellant filed an Omnibus Pre–Trial Defense Motion that specifically included a Motion for a Speedy Trial, the first time he raised the issue of a violation of this right is on appeal. The transcript reflects that appellant moved to dismiss the indictment on April 22, 1998, based on his section 12–106 argument. During the course of arguments before the trial court, appellant's counsel analogized his section 12–106 argument to a speedy trial argument:

> It's clear that this trial if he had not remained incompetent for all the period of time, or because he has remained incompetent, it made his defense much worse. It's a speedy trial argument because—*I mean it's not a speedy trial argument, but it is the same basis,* he has been prejudiced because he has been incompetent.

Appellant never raised a speedy trial argument; he only likened his section 12–106 argument to a speedy trial argument. Because appellant failed to raise the speedy trial issue to the trial court, we decline to address the issue. *See* Md. Rule 8–131(a); *see also In re John H.,* 293 Md. 295, 303, 443 A.2d 594, 598 (1982); *Tapscott v. State,* 106 Md.App. 109, 124, 664 A.2d 42, 49 (1995), *aff'd,* 343 Md. 650, 684 A.2d 439 (1996); *Marks v. State,* 84 Md.App. 269, 281, 578 A.2d 828, 834 (1990), *cert. denied,* 321 Md. 502, 583 A.2d 275 (1991).

■ With regard to the section 12–106 argument, appellant contends the trial court should have dismissed the indictment against him because he was prejudiced by the amount of time that had passed until the case was brought to trial. Specifically, appellant argues he did not receive any treatment while a patient at Clifton T. Perkins Hospital and, because of the delay due to his hospitalization, efforts to secure a potential alibi witness were unsuccessful because she was difficult to locate and her memory as to the dates she was with appellant was no longer lucid.

We conclude that the trial court did not abuse its discretion in denying appellant's motion to dismiss the indictment. First, although we fail to see why the amount and type of

treatment appellant received while a patient at Perkins is relevant, appellant testified that he received Haldol at some point. Furthermore, the trial court found that appellant seemed to have been treated well and apparently all he needed was time and rest to recover because ultimately he had been found competent enough for trial.

Second, the statute at issue does not specify whether the five-year period ends when an incompetent is later declared competent to stand trial or if the time ends at the start of the criminal trial. A cursory review of section 12–106's statutory history likewise revealed no indication of which point in time the Legislature intended. Regardless, the statute does make clear that it is within the trial court's discretion to make the determination of whether a defendant has been so prejudiced by the length of his or her incompetency that the charges should be dismissed: *"if the court considers* that resuming the criminal proceedings would be unjust because so much time has passed since the defendant was found incompetent to stand trial, the court *may dismiss* the charge." § 12–106(a) (emphasis added). The trial court in this case used its discretion in finding that trying appellant for the solicitation charge would not be unfair:

> Well, I'm recalling that you entered a stipulation that [appellant] received no treatment toward his ultimate release while he was at Clifton T. Perkins, and if that is your stipulation, I accept that stipulation. It would appear then that all he needed was rest and time, because while he was not competent before, he appears to this Court to be absolutely competent. Apparently he appeared to [J]udge Gordy to be absolutely competent. So Judge Gordy having found so, and this Court having found so, apparently he was treated well. By treated I mean, he was well-served to the extent that he apparently changed from incompetent to competent. Within the Court's discretion, to dismiss or not to dismiss, this Court denies the motion to dismiss.

We do not think the trial court abused its discretion in denying this motion. Although appellant said that because of the delay his potential alibi witness could no longer recall the

dates she was with appellant, the State responded that after its discovery request made while preparing for trial before appellant was declared incompetent, it never was notified of an alibi witness. Indeed, appellant attributes this to his incompetence to assist in the trial preparation. In any event, appellant did not present his alibi witness at the trial below to let the jury determine whether her memories were too attenuated to assist appellant. There was no direct admissible evidence that her memory had faded. The trial court determined that appellant had not been so prejudiced by his incompetency and we cannot say that it abused its discretion in this respect. We affirm the trial court.

### III. Conclusion

In conclusion, we hold that the trial court did not abuse its discretion in denying appellant's motion *in limine*, motion for mistrial, and motion to dismiss the indictment. Accordingly, appellant's conviction is affirmed.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

BELL, C.J., and ELDRIDGE and RAKER, JJ., dissent.

RAKER, Judge, dissenting:

The trial court erroneously admitted "bad acts" evidence and other irrelevant and prejudicial evidence. Because the error was not harmless beyond a reasonable doubt, I would reverse the judgment of conviction.

In order to understand the prejudicial nature of the evidence, it is necessary to recount the context in which it was offered. At the beginning of the trial, defense counsel indicated to the trial court that the defendant had entered two pleas—not guilty and not criminally responsible at the time the alleged acts were committed. Klauenberg requested a bifurcated trial on the issue of criminal responsibility, and sought to exclude evidence of his mental condition from the guilt/innocence phase. Defense counsel emphasized to the

court that the responsibility issue was essentially a formality, in that the State had agreed to stipulate that Klauenberg was not criminally responsible. The State opposed bifurcation, maintaining that the jury needed to know that "we are dealing with a not criminally responsible defendant committing a criminal act ... in order to render a verdict in this case." [1] The trial court rejected the State's argument, and bifurcated the issue of responsibility from the determination of guilt or innocence.

It seems to me that notwithstanding the decision of the trial court to bifurcate the issue of criminal responsibility, the State nonetheless set out to put before the jury the evidence of Klauenberg's bizarre conduct. Unless the trial court found special relevance and the remaining *Faulkner* test was satisfied, the evidence was irrelevant and inadmissible.

I glean from the opening statements that the defense in this case was that Klauenberg did not in fact intend to have Judge Murphy killed.[2] Both the State and the defense talked to the jury about whether Klauenberg had the means to commit the offense. Under these circumstances, Klauenberg's possession of guns and ammunition might well have been highly relevant

---

1. The State also argued:
 So it would be deceiving the jury, because there is no issue. If the jury didn't know that this defendant, who is on trial for this crime, is an individual that all sides agree is not criminally responsible for his conduct. Because when they hear this conduct, they are going to say, boy, this is a bizarre guy. What is going on here. And we would be deceiving the jury, and they wouldn't be able to understand the context in which this defendant committed this criminal act, if they weren't realizing they are dealing with a person who is not criminally responsible.

2. In opening statement, defense counsel told the jury:
 Maybe he stopped at the car wash simply to, if he was there at all, simply to gain some companionship, start a conversation, whatever. Be sure that you believe before you find any kind of guilty verdict, that he said these things to be consistent, and that is most important, he really meant, did he really mean to have this particular judge killed. As strange as it sounds being, meant to have, this is solicitation only for this judge, be sure that you believe that he really meant to have that particular person killed.

to the proceedings. Unfortunately, the *Faulkner/Streater* requirements for admissibility were never satisfied.

The majority holds that any *Faulkner* analysis was unnecessary because the evidence at issue did not constitute "bad acts." The majority sets out a workable test for determining whether particular conduct constitutes misconduct, bad acts or other crimes evidence under Md. Rule 5–404(b):

> a bad act is an activity or conduct, not necessarily criminal, that tends to impugn or reflect adversely upon one's character, taking into consideration the facts of the underlying lawsuit.

Maj. op. at 549. Purporting to apply this test, the majority holds that the testimony regarding the guns was not "bad act" evidence because (1) there was no indication that the guns were obtained or possessed illegally and (2) no evidence was offered at trial that the guns were to be used to shoot Judge Murphy. Maj. op. at 551. I disagree.

Clearly the trial court never engaged in the requisite *Faulkner* analysis for the admission of this evidence. We focus here not on special relevancy, standards of proof, or balancing interests, but consider only the threshold question of whether the conduct in question was misconduct or bad acts which trigger a *Faulkner* analysis. Although Klauenberg's possession of the guns was not necessarily criminal, the majority fails to consider whether his conduct tended to reflect adversely upon his character, taking into consideration the fact of the pending charge, solicitation to murder. Considering the circumstances of the instant case, evidence that Klauenberg secreted guns and ammunition in the ceiling of his basement suggests illegal or illicit conduct, thereby impugning his character.[3] It seems to me that persons possessing guns legitimately do not ordinarily hide them in the basement ceiling; a reasonable inference is that this is a bad guy or a person acting in a bizarre manner.

---

**3.** As pointed out by the majority, "[n]o evidence was offered at trial that appellant's guns were to be used in the murder." Maj. op. at 551.

The court held a pre-trial hearing on Klauenberg's motion *in limine* to exclude evidence relating to the *Francis v. Klauenberg* estate proceeding on the grounds that such evidence constituted "bad acts" evidence. The State's position was that evidence of acts relating to this previous proceeding should be admissible:

> The State's position, Your Honor, is, this evidence is not of prior bad acts, but is actually an essential part of the crime that the defendant is charged with.
>
> What we are showing is, the defendant, because of the rulings of Judge Murphy, because of the contentious proceeding in *Francis vs. Klauenberg,* was originally such high emotion or whatever, driven to, in 1992, solicit Mr. Palmer to murder Judge Murphy. For the jury just to know that Mr. Palmer was solicited on a couple of occasions, and not be aware as to why in the world this defendant would want to injure a Circuit Court Judge would be a preposterous situation for this jury. They would be sitting here saying, well, what in the heck does this defendant want to kill a judge for.[4]

The State proffered that the testimony relating to the *Francis v. Klauenberg* proceeding would be limited to "witnesses, like Mr. Twomey, to say that he represented Ms. Francis, the reason why the suit was filed, the outcome of the suit, and any action or reaction this defendant may have had towards Judge Murphy during the time of the trial." The State described the testimony it wished to offer as having "a very narrow scope," and insisted that it was "not trying to relitigate *Francis v. Klauenberg.*" According to the State, "we want the jury to know what the case was in the beginning, why this law suit, this civil action was litigated, what the results were, and how it affected this defendant, and its effect caused this defendant to

---

**4.** Consistent with this position, the State argued in opening statement that "we will present some evidence concerning the estate to show the ruling of Judge Murphy, and how he so infuriated this defendant, that he wanted to have the judge killed."

solicit an individual to kill Judge Murphy; that's what it's all about."

The court denied the defense motion to restrict the evidence relating to the estate matter, ruling that "if we do not allow the State to present some background as to this alleged crime, that the jury will not be able to ferret out what the case is all about." The court continued:

Now, the State, of course under Maryland law is not required to prove a motive. But that doesn't mean the State can't insert proof of a motive. Particularly, if that proof lends to some information to make the jury know where the case started and how far it comes.

The State presented evidence of the condition of Klauenberg's home,[5] that Klauenberg was confrontational when per-

---

5. The majority holds that this issue of the condition of Klauenberg's home was not preserved. Maj. op. at 542. I disagree. The majority states that appellant objected only "to the irrelevance of Twomey's depiction of appellant being confrontational." *Id.* This is not the only possible understanding of appellant's objection. Appellant's objection may also be read as an objection to a broader scope of testimony relating to visits to Klauenberg's home, visits during which Judge Murphy was not present.

The relevant portion of Twomey's testimony was as follows:
THE STATE: How was [Klauenberg's] conduct toward Judge Murphy during this trial from 1985 to 1992?
DEFENSE ATT'Y: Objection. It's too broad, Your Honor.
THE COURT: Overruled.
Twomey then proceeded to describe the two "steps" of *Francis v. Klauenberg,* the first dealing with the determination of legal issues, and the second dealing with actually tracking the assets of the estate. Twomey's testimony with regard to this second phase was as follows:
TWOMEY: ... we then moved into that phase of having to go to the house that he was living in which was his father's home, and go in there and literally find pieces of paper to try to trace assets.
 During that time, his demeanor was equal to his demeanor in the courtroom, and at certain times during going to the house, collecting financial records, it became more confrontational.
DEFENSE ATT'Y: Your Honor, I'm going to object, unless Judge Murphy was there, I don't see any relevance.
THE COURT: Overruled. What do you mean by confrontational, sir?
TWOMEY: Specifically there was one event and to paint the scene, we were in the living room. The room was, you couldn't get to the floor, stand on the floor. We were walking on top of where it had been packed down where much like in your mind's eye, where if you

sons visited his home,[6] that he assaulted a lawyer,[7] and weapons concealed in his home.[8] The State's picture of

_____

are in a yard that's overgrown and animals run through their pathways with people walking. We are in a room where paper had been piled as high as approximately my waist, but where the occupants had walked. There were beaten down paths that I would say that the paper at points was compressed down to no less than six to eight inches and then around it was kind of piled up.

6. The majority holds that the issue of Klauenberg's confrontational behavior was not preserved. Maj. op. at 541. I disagree. The majority writes that "the Court of Special Appeals in *Jeffries v. State*, 113 Md.App. 322, 341, 688 A.2d 16, 25, *cert. denied*, 345 Md. 457, 693 A.2d 355 (1997), held specifically that a party who objected to testimony at trial only as to general relevance could not argue for the first time on appeal that the testimony was inadmissible evidence of other bad acts." Maj. op. at 542. In my opinion, an objection on the grounds of relevance should be sufficient to preserve the issue of "bad acts" evidence. The *Faulkner* test is used to exclude evidence of "bad acts" evidence that is not specially relevant to the issues at trial. *See State v. Faulkner*, 314 Md. 630, 552 A.2d 896 (1989). I believe that appellant's objection on grounds of relevance was sufficient.

7. The relevant portion of Twomey's testimony was as follows:
TWOMEY: Mr. Klauenberg stepped in front of me and started—
DEFENSE ATT'Y: Objection.
THE COURT: Overruled.
TWOMEY: Started a verbal, you know, attempted, I don't remember his exact words, but it was attempting to get me to back down and not do what I was there to do, and then ultimately ended up with his starting some, you know, in very close to my face, pounding on my chest, pounding as too strong, poking on my chest with his index finger, and there was a police officer back on the other side of the room who had to interject and tell John to back off and to stop. It was very confrontational, very angry, and my mind was whether I had justification to physically stop him for what he was doing or not. And was there a need to physically stop him, was it going to escalate to that next level where something more aggressive would be done by him, and I drew that from his physical presence where he was leaning forward, the anger in his face, just parading terrific anger, comparable to other things I have experienced in my life, and nothing—it was a very serious and intense moment.

8. Twomey testified:
THE STATE: What, if any, weapons did the defendant keep at his house?
DEFENSE ATT'Y: Objection.
THE COURT: Overruled.
TWOMEY: We found in his home, two pistols. If memory serves correctly, one was a .38 revolver, and I forget what the other one

Klauenberg continued in closing argument, when the State argued:

> ... you heard from the witnesses about an ongoing estate problem. There is no doubt in anyone's mind sitting in this courtroom that there was a problem in *Francis v. Klauenberg*, that was the problem. He was not a happy camper ...
>
> There was testimony from Mr. Twomey about how unhappy he was, how when he came out to the house in Kingsville, how he had to have the police with him. How the defendant had a cache of weapons there.

In my opinion, such evidence went beyond anger that Klauenberg experienced toward Judge Murphy, and instead evidences the State's intention to paint Klauenberg as a violent, eccentric, mentally disturbed person who was prone to committing mentally unstable acts. The inference that the jury may have drawn from this evidence, that because Klauenberg was a particular type of person, he solicited murder, is precisely the type of inference Md. Rule 5–404(b) prohibits.

Klauenberg also argues that Twomey's testimony about how he became verbally confrontational and poked Twomey in the chest were improperly admitted evidence of bad acts. The majority concludes, in an *ipse dixit* fashion, that "[r]aising ones voice and poking someone in the chest alone is not conduct that tends to impugn someone's character." Maj. op. at 551. An unpermitted touching may obviously constitute an assault in violation of Maryland Code (1957, 1996 Repl.Vol.,

---

was, and they were in a trunk as we went through. Then we, there was one place that Mr. Klauenberg would stand downstairs in the basement. Upstairs he would wander around with us. There was one place he stood without moving while people went into other rooms in the basement, and fortunately the police were literally right next to him, surrounding him as he went through this exercise.

\* \* \* \* \*

... the next time we went in, we discovered right above that spot a loose ceiling tile, it was based on a low hanging ceiling, and when that ceiling tile was slightly ajar was moved standing on the ground reaching in, we found a .22 automatic pistol, fully loaded clip in, seated in the pistol and 600 rounds of ammunition next to it.

1998 Supp.) Article 27, § 12, 12A. Because the evidence constituted "bad acts" evidence under the circumstances of this case, and was objected to by Klauenberg, the trial court should have engaged in an on-the-record *Faulkner* analysis to determine whether the evidence had special relevance, whether there was clear and convincing evidence that the acts occurred, and whether the probative value of the evidence outweighed the unfair prejudice. *See Streater v. State,* 352 Md. 800, 724 A.2d 111 (1999).

The real inquiry, I suggest, is not whether the trial court committed error. In my view, error clearly occurred. The question is whether the error was harmless beyond a reasonable doubt. *See Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976). The error was not harmless, the judgment of the circuit court should be reversed and the case remanded for a new trial.

Chief Judge BELL and Judge ELDRIDGE have authorized me to state that they join in the views expressed herein.

<hr>