832 A.2d 834

Gerard A. HUDSON

v.

STATE of Maryland.

No. 2764 Sept. Term 2000.

Court of Special Appeals of Maryland.

Oct. 2, 2003.

Julia Doyle Bernhardt, Assistant Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Zoe Gillen White, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., MOYLAN, CHARLES E., JR. (Ret'd, Specially Assigned), THIEME, RAYMOND G., JR. (Ret'd, Specially Assigned), JJ.

THIEME, Judge.

Gerard A. Hudson appeals from the judgments of conviction by a Baltimore City jury on two counts charging second degree murder, and two counts of conspiracy to commit first degree murder.

By separate indictments filed in the Circuit Court for Baltimore City, Hudson was charged with two counts each of first degree murder, use of a handgun in the commission of a crime of violence, carrying a handgun, and conspiracy to commit first degree murder.[1] After his convictions, he was sentenced to two consecutive terms of thirty years' imprisonment on the murder convictions and a consecutive life sentence for one conspiracy; the additional conspiracy was merged for purposes of sentencing. In his appeal, Hudson presents the following issues, which we have recast:

1. Did the trial court abuse its discretion in admitting hearsay evidence?

2. Must the convictions for conspiracy to commit murder be reversed in view of the jury's inconsistent finding of guilt for second degree murder?

3. Did the trial court's denial of the defense motion for a mistrial constitute an abuse of discretion?

---

1. Md.Code (1957, 1996 Repl.Vol.), Art. 27, §§ 407, 36B(d), 36B(b).

4. Was the evidence sufficient to support the convictions for second degree murder and conspiracy?

We shall affirm the convictions.

## Facts

The appellant's prosecution emanated from the murders of Al Duante "Dante" Brown and Clarence "Pops" Miller on December 30, 1999, in Baltimore City. The two victims were dropped near the corner of North Avenue and Ashburton Street.

### The Murders

Catherine Lee was an eyewitness. She was Miller's fiancée, and was also acquainted with Dante Brown, who hung out for a while at Miller's house in Baltimore. Around 9:00 p.m. on December 30, Miller accompanied Lee to the "Cut Rate," a liquor store/bar, on Braddish at North Avenue. On the way they encountered Brown near North and Ashburton. When Lee entered the "Cut Rate," Miller remained outside with a friend; Brown stayed farther down the block.

After Lee left the "Cut Rate," she and Miller crossed over to North Avenue, met Brown, and the trio proceeded to walk down North Avenue back toward Ashburton. As they turned onto Ashburton, Lee happened to turn around to see an individual approaching from behind. This person, who obscured his face with a bandanna, overtook Miller and Lee and headed straight for Brown.

The stranger briefly addressed Brown, got no reply, and reached for "something" from his pants. Lee could not identify the object, but she anticipated trouble. Perhaps presaging a robbery about to occur, she began "easing back." As she started to cross Ashburton, a gunshot rang out, and she ducked behind a parked van. She claimed to be scared, because "they" were shooting. Lee saw that Miller was struggling with Brown's assailant, and heard two separate, additional volleys of gunfire.

After the shooting ended, Lee remained behind the van for a brief period. She saw a person, resembling the assailant from the back, running away from the scene. She did not recall seeing anyone else, but, she remained safely behind the van and thus did not watch all of the action.[2] After this, Lee went to the police.

## Admissions of Guilt

On December 31, 1999, at about 11:00 a.m., appellant arrived at the apartment of Rene Knight to visit with Knight's son. Knight, who was 43 years old at the time of her testimony, had known both appellant and his friend Pierre[3] for about five years. She had been a former neighbor of appellant's on Braddish Avenue. At the time of these events, Knight lived with her daughter in a second-floor apartment located over a flat that was occupied by appellant's sister, Tamika Hudson, on Barnes Street in Baltimore.

Appellant, wearing a black bandana, approached Knight and asked whether she knew about the events of the previous evening. When Knight professed ignorance, appellant told her that he had shot someone on North and Ashburton, claiming as a reason that "his mother had been disrespected." Appellant said that he had waited until dark before shooting his victim. He also claimed that he had been accompanied by his friend "Pierre," who in turn "dealt" with the other person

---

**2.** According to Detective Wayne Jones, the initial investigative theory of the case was based on the involvement of a "lone gunman," because of Lee's sighting of one assailant, and the initial discovery at the murder scene of eight shell casings from a .45 caliber semi-automatic weapon. This theory lasted until the next morning, however, when the autopsy examinations for both victims yielded findings of projectiles from two separate weapons.

**3.** Louis Pierre Easter. Easter was tried separately and convicted of first degree murder, conspiracy to commit first degree murder, second degree murder, two counts each of using a handgun in the commission of a crime of violence, and of carrying a handgun. He drew a life sentence for the first degree murder conviction, various concurrent sentences, and a consecutive thirty-year term for the second degree murder. His convictions were upheld on appeal by a separate panel of this Court.

because that individual had "disrespected his grandmother." Knight unsuccessfully attempted to encourage appellant to go "talk to somebody" or turn himself in. During this conversation, Pierre Easter, who was present, maintained his silence.

After this episode, appellant went to another room to play a video game with Knight's son and son-in-law. Although appellant appeared to be upset that his mother had been insulted, he showed to Knight "no conviction, no remorse, no nothing" about the previous night's events.

Knight recalled seeing a handgun that morning in the hands of appellant's cousin, Bianca Young. She had heard what appeared to be "gunshots," and went to investigate. Appellant seemed amused when Knight inquired about them. Knight thought this weapon was a .38 caliber pistol with a brown handle and a quarter-inch barrel, and ordered that it be taken from the apartment away from "unreliable teenagers." At trial, Knight identified a .32 caliber handgun as the weapon she had seen on the 31st. This was the handgun removed from appellant's home by Detective Williams.[4] Knight admitted that she had not contacted the authorities about appellant's statements.

Bianca Young, appellant's cousin, was fourteen years old at the time of her testimony. Bianca testified that appellant had admitted to her that he had gotten into an argument with a man the previous day because the latter had "disrespected [appellant's] mom," calling her a "bitch." Appellant said that he shot this person once, and that his friend Pierre Easter had shot the victim's companion, because that man was "running his mouth." Pierre Easter was present, and, according to Bianca, had blood on his coat and a cut on his head. In

---

4. Firearms Examiner William Withers could not conclude to a reasonable degree of scientific probability that two rounds recovered from the post mortem examinations of the victims came from this .32 caliber weapon, but affirmed that they were consistent with that gun. The "caliber and the rifling characteristics [were] the same." Withers also examined eight shell casings, which were from a .45 caliber semi-automatic handgun and were recovered from the murder scene. That weapon was not recovered.

contrast, appellant had no blood on his clothes and no apparent injuries. The pair displayed a black handgun. Bianca identified this handgun as the same weapon recovered from appellant's home and also identified by Knight. Bianca noticed that both appellant and Pierre had bandannas.

Eva Coleman is Dante Brown's mother. She admitted that her son was a cocaine addict, and that he would often entrust her with money from his paycheck so that he would not spend all of his earnings on drugs. On December 30, Coleman accompanied Brown to pick up his paycheck, and then took him to the bank to deposit all but $40. Concerning the money, she said that Brown paid money to "a guy named Little Glenn[,]" a member of the extended family, and guessed that the debt was "for drugs." She then took Brown to the vicinity of Coppin State College. She did not see him again until he returned home at 4:30 that afternoon. Coleman recalled that Brown was in a rush, and was not wearing his coat. She became concerned for his welfare; he obtained more money. She did not know what would happen to her son "out on the streets." Coleman explained that "he might get killed, stabbed. Anything could have happened to him because I knew he had a problem ... a drug problem." Other than this, she could not recall anything in particular that prompted her concerns.

On cross-examination, Coleman responded in the affirmative when questioned whether she had a "lot of concerns about [Brown's] safety generally ... because he was a drug user and he was out running the streets[.]" She then agreed with trial counsel's question that, "... because he was a drug user, he would have debts to drug dealers...."

## The Investigation

Police investigations brought them to appellant's home on January 5, 2000. Appellant, 16 years old at the time of the homicides, lived with his mother, Mattie Hudson, at 1906 Braddish Avenue. On that date, a number of plainclothes officers, including Detective Antoine Williams, were cruising in an unmarked sedan near appellant's home. They encountered

appellant on the street, and one of the officers conducted what Detective Williams described as a "field interview."[5] As a result of this, the officers proceeded to appellant's house, where they were met by his mother, from whom they obtained permission to search appellant's bedroom. Detective Williams located a loaded Burgo .32 caliber revolver from under a mattress in what was thought to be Gerard Hudson's room.

Appellant was interviewed by police on March 10, 2000, and provided a recorded statement that was played at trial.[6] He told officers that on the night of the 30th, he was sitting in his brother's bedroom when Pierre Easter "came in there and he asked me let him hold the gun." He had told Easter where it was kept. Easter explained to appellant that someone had insulted his grandmother. According to appellant, Easter "grabbed the gun from under the mattress and he put this black scarf on his face and went downstairs and came outside." Appellant said that he then went outside, walked to the corner, saw that Easter was down at Ashburton, "and [saw that] he [Easter] raised the gun up to the man . . . and he fired one shot." Appellant went home, then returned to the street, heard three more shots, then went toward Ashburton "to see who—Pierre before he fired the three, the other three shots the man was tussling." Appellant said that as the last three shots were fired he "got to the corner[.]" Both Easter and appellant then ran back to appellant's home. Appellant admitted that the weapon found in his brother's room, the one recovered by Detective Williams, had been used in the shootings.

Dr. Wayne Fowler, Deputy Chief Medical Examiner, performed the autopsies on both Miller and Brown. From the former post mortem examination, Dr. Fowler recovered three bullets, two from a large caliber weapon and the third from a "much smaller" caliber. In addition to his other wounds,

---

5. For the legal implications of a "field interview," see *Graham v. State*, 146 Md.App. 327, 807 A.2d 75 (2002).

6. A pretrial motion to suppress this statement was denied, and the defense objected to its introduction at trial.

Miller had been shot in the back four times with the larger caliber weapon.

Detective Jones conducted part of the interview, and asked appellant about the gun. Appellant replied that the weapon had been placed under a mattress in his brother's room. When asked to explain how the police had obtained the weapon, appellant replied:

> They ... when I was ... arrested for a CDS[7] charge and ... the police asked me where I lived at and I told him and I showed him where I lived at. And he asked my mother could he check[ ] the house and ... she replied yes[.] ... And he went in there and checked the house and he found the ... gun.

When asked to describe the victims, appellant said he couldn't see them, but recalled, "I think one of them had on a red jacket."

Additional facts as necessary will be presented in our discussion below.

## Discussion

### I. Victim's Hearsay Statement

#### *Introduction*

Appellant attacks the trial court's admission, through the testimony of an investigating detective, of certain statements the decedent Dante Brown purportedly made to his mother, Ms. Coleman. Citing this as "double hearsay," and exhorting prejudice, appellant insists that the statements made by Dante to his mother "provided the jury with a much more compelling motive for murder than the 'disrespecting' of relatives[.]" That motive, appellant observes, was a supposed drug debt. The State counters initially that the defense failed to preserve its objection to the admission of the specific statement at issue, and secondly that the action taken by the trial judge

---

7. Later in the interview, appellant again acknowledged that he had been arrested on a "CDS [controlled dangerous substance] charge."

was well within his discretion, and finally that any error was harmless.

We find that any error in the admission of the contested statements was harmless beyond a reasonable doubt. To place this issue into its appropriate perspective, we must rehearse the course of the trial that led to the admission of Dante Brown's hurried words.

During the State's examination of Detective Wayne Jones, who interviewed Eva Coleman, the following occurred:

[PROSECUTOR]: All right. And directing your attention to State's Exhibit 10 for identification purposes only, would you take a moment to review that, please, and tell us if that is your summary of what she told you and if it's accurate?

[WITNESS]: Yes.

[PROSECUTOR]: The questions I'm about to ask you, you cannot answer with telling us what Dante said, okay?

[WITNESS]: Correct.

[PROSECUTOR]: I'm going to ask you what if any reason did she give for Dante coming into the house without his coat on?

[DEFENSE]: Objection.

THE COURT: Basis?

[DEFENSE]: Leading and it's asking for hearsay.

THE COURT: Well, the witness is available. I suspect this witness will be back here to be cross-examin[ed]—

[PROSECUTOR]: Yes, Your Honor.

THE COURT:—for cross-examination? I'll overrule the objection.

[PROSECUTOR]: You can answer.

[WITNESS]: Okay. Can you repeat the question again, please?

[PROSECUTOR]: Yes. What if any reason did Ms. Coleman give for why Dante came back into the house at 4 to 5:00 in the afternoon without his red coat?

[WITNESS]: The reason was he was being pursued by someone.

[PROSECUTOR]: Did she tell you that?

[WITNESS]: Yes.

[PROSECUTOR]: All right. And how—

THE COURT: Excuse me, counsel. Now let's base this on the understanding that Ms. Coleman will be brought back.

[PROSECUTOR]: Absolutely.

THE COURT: And, therefore, Ms. Flynn will have an opportunity to cross-examine—

[PROSECUTOR]: Absolutely.

THE COURT: Ms. Coleman. Let's go.

[PROSECUTOR]: Thank you, Your Honor.

[PROSECUTOR]: And how, if at all, did she say he was behaving at 5:00 when he came back into the house?

[WITNESS]: He was very, very erratic. He had changed his clothing. He was very nervous. She tried to get him to stay inside the house.

[PROSECUTOR]: And why did she tell you she wanted him to stay inside the house?

[WITNESS]: For fear of his safety. She had concerns that something was wrong.

[PROSECUTOR]: What, in particular, was she—did she tell you she was concerned—

[WITNESS]: She was concerned, that after he rushed in excited, she tried to encourage him to, to avoid going back out for fear of being harmed.

[PROSECUTOR]: And did she tell you what, in particular, she was worried would harm him?

[WITNESS]: Persons whom he owed money to for drug debts.

[PROSECUTOR]: And what, if anything, did she believe had just happened right before he came into the house?

[DEFENSE]: Objection. Leading, Your Honor.

[PROSECUTOR]: I'll rephrase it.

THE COURT: Also requiring the witness to speculate about another person's state of mind, so I'll sustain the objection.

[PROSECUTOR]: What, if any, understanding did she—

THE COURT: Excuse me. Counsel, come up. Let's come up.

\* \* \*

THE COURT: This has become—

[PROSECUTOR]: Well, I can do it that way. That's fine.

THE COURT:—having him speculate—speaks for itself.

[PROSECUTOR]: Okay, I'll do it. . . .

[DEFENSE]: Then I'll put my objection on the record for that. He indicated that he spoke to her shortly after the murder for identification purposes, which would have been December 31st. This is dated January 3rd. But on the bottom, on the printout, it's dated January 5th, so these are not notes that were made simultaneously with the interview based on what I've been given.

THE COURT:—lay a foundation for that.

[PROSECUTOR]: He can explain.

THE COURT: He can explain—dates and—I'll sustain that objection.

Anything else, Ms. Flynn?

[DEFENSE]: No. Your Honor.

THE COURT: All right.

\* \* \*

[PROSECUTOR]: Detective Jones—. . .

— can you, by reviewing your case folder, tell us precisely when you had the conversation with Ms. Coleman?

\* \* \*

Detective, did you find—did you determine from your notes the precise date that you took the statement?

[WITNESS]: The date would be the 3rd, January the 3rd.

\* \* \*

Of 2000, the date of the report.

[PROSECUTOR]: Okay. Now directing your attention to the particular area of the report I'm going to show you, I'd ask you to read—

\* \* \*

Detective, the document which is marked for identification purposes only as State's Exhibit 10, this is a—you've testified this is a summary of the statement she gave on or about January 3rd of 2000?

[WITNESS]: Correct.

[PROSECUTOR]: And are documents such as this one made in the ordinary course of business by you as a homicide detective?

[WITNESS]: Yes, they are.

[PROSECUTOR]: Are documents such as this one kept in the ordinary course of business by you as a homicide detective?

[WITNESS]: Yes, they are.

[PROSECUTOR]: Was this particular document made and kept in the ordinary course of your business, the investigation of this particular pair of murders?

[WITNESS]: Yes.

[PROSECUTOR]: Thank you. And directing your attention specifically to the sentence that begins "At" and ends with the following sentence, "excited," can you please read that out loud?

THE COURT: Well, before it gets read to the jury, can you move to put it in evidence—Ms. Flynn make her objection?

[PROSECUTOR]: Well, Your Honor, we've agreed to do [it] this way.

[DEFENSE]: I'm sorry, can we approach one more time?

THE COURT: All right.

\* \* \*

[DEFENSE]: Your Honor, what the State is attempting to get in is a sentence—a statement made by the decedent to his mother. I think under any circumstance that's hearsay. The fact—

THE COURT: What's he say?

[DEFENSE]: "I just ran into somebody I don't need to see." That's hearsay. Whether or not it comes in through the officer or through the mother, it's still hearsay.

THE COURT: And you don't think the business record exception—

[DEFENSE]: It's double hearsay.

THE COURT: You don't think it's an exception to the hearsay rule since it's a business record?

[DEFENSE]: Well, it wasn't the decedent giving the statement, it's the mother giving a hearsay statement to the police officer. So I don't think just because she gives it to a police officer it cures the original hearsay that the statement was made by the decedent. And the mother couldn't testify to it simply on the grounds of hearsay. So I'm not sure when—the recollection of it wasn't complete. She can't get on the stand and say my son said this to me. And simply because she told the police officer that and it's recorded at the time doesn't cure the hearsay nature of his statement to her.

THE COURT: I just ran into somebody I don't need to see?

[DEFENSE]: Right.

\* \* \*

THE COURT: One more try.

[DEFENSE]: Despite the fact that she read the statement out in the hall, she can't remember it. Like, it—simply because she told the police officer what he said does not cure the nature of the hearsay. She can testify that he was upset, which she wasn't able to do. She can testify that he

was in and out in a rush. She couldn't testify that he changed his clothes, which she didn't because she doesn't remember. But she cannot testify as to what he said to her, which is being offered for the truth of the matter, so—

THE COURT: I will deny the objection—overrule the objection. The case may come down to—hearsay rules and—and the whole circumstances here. The testimony of the previous witness—she'll be back again because—indicating that-very excited and—

\* \* \*

[PROSECUTOR]: Sergeant, directing your attention to State's Exhibit 10 for identification purposes only—

THE COURT: I think we are at the point where I suggested that I really don't want it read unless it's in evidence.

[PROSECUTOR]: Oh, good point.

Your Honor, I would offer State's 10 into evidence at this time.

THE COURT: All right. Continuing objection, Ms. Flynn?

[DEFENSE]: Yes, Your Honor, and we also discussed a redaction.

[PROSECUTOR]: Which I will do.

THE COURT: Objection overruled. Go ahead.

(Whereupon, State's Exhibit No. 10 was received into evidence.)

[PROSECUTOR]: Thank you, Your Honor.

[PROSECUTOR]: Detective, I'd like you to read out loud from "At approximately 4 to 5 p.m." and stop at "excited," if you would, please.

[WITNESS]: Yes, ma'am. "At approximately 4 to 5 p.m., the victim ran into his home through the rear entrance, without a coat and a hat, then said, 'I just ran into someone I didn't need to see.' The victim said to his mother that he took off his hat and red coat to change his appearance to the person or persons. The victim was rushed and excited."

## Preservation

■ The State energetically maintains that appellant failed to preserve "in part" his objection to some of the testimony at issue by failing explicitly to object to all of Detective Jones's testimony. The State discounts the defense, specifically objecting to the testimony considered to be the more damaging to its case, *viz.* Dante's statements to Ms. Coleman.

We disagree with the State. Counsel, as shown by the above-quoted testimony, vigorously contested those aspects of the detective's testimony that rested upon statements collected from Ms. Coleman. Further, defense counsel voiced a "continuing objection" after the State offered into evidence Detective Jones's record of the interview of Ms. Coleman, and, while losing that skirmish, saw to it that the State would introduce only a redacted version of the detective's report.

The defense appropriately objected to the evidence at issue in this appeal. The overall hearsay issue has been adequately preserved.[8] *Borchardt v. State,* 367 Md. 91, 131, 786 A.2d 631 (2001), *cert. denied,* 535 U.S. 1104, 122 S.Ct. 2309, 152 L.Ed.2d 1064 (2002); *Graves v. State,* 334 Md. 30, 37–38, 637 A.2d 1197 (1994).

## Nature of the Hearsay Problem

Initially, we must determine the nature of the asserted secondary hearsay present in the form of Dante's statement, and then the primary hearsay consisting of Eva Coleman's

---

**8.** *Cf. Johnson v. State,* 325 Md. 511, 601 A.2d 1093 (1992), wherein Judge Orth explained that the Court would entertain an appeal on the basis of a single objection, despite the defendant's failure to raise continuing objections to improper closing argument:

We think the objection went not only to what was said but also to what was obviously to come. By overruling the objection, the judge demonstrated that he was permitting the prosecutor to continue along the same line. It was apparent that his ruling on further objection would be unfavorable to the defense. Persistent objections would only spotlight for the jury the remarks of the prosecutor. In the circumstances, the absence of a further objection did not constitute a waiver.

325 Md. at 514–15.

interview, which was then recorded by Detective Jones. There are two approaches to the problem of hearsay.[9] One focuses on the purpose for which the evidence is offered: hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. This is a traditional definition of hearsay as articulated in Md. Rule 5–801(c). The other focuses on the origin of the evidence: hearsay is evidence the probative force of which depends on the competency and credibility of a person other than the testifying witness. *See* Md. Rule 5–804(b)(5).

 "Generally, statements made out of court that are offered for their truth are inadmissible as hearsay, absent circumstances bringing the statements within a recognized exception to the hearsay rule." *Su v. Weaver*, 313 Md. 370, 376, 545 A.2d 692 (1988) (citing *Kapiloff v. Locke*, 276 Md. 466, 471, 348 A.2d 697 (1975)). The Hearsay Rule is a rule of exclusion, and thus the proponent of the disputed evidence bears the burden of showing that the Rule does not apply. *See Cassidy v. State*, 74 Md.App. 1, 7–8, 536 A.2d 666, *cert. denied*, 312 Md. 602, 541 A.2d 965 (1988). No statement at issue here would offend the hearsay rule if the evidence was "offered for some purpose other than to prove the truth of the matter asserted therein[.]" *See Ashford v. State*, 147 Md.App. 1, 75, 807 A.2d 732 (quoting *Ali v. State* 314 Md. 295, 304, 550 A.2d 925 (1988)), *cert. denied*, 372 Md. 430, 813 A.2d 257 (2002).

 At first blush, it may appear that Dante Brown's statement to his mother, who in turn relayed it to Detective Jones, presents a prototypal "hearsay within hearsay" para-

---

**9.** Some would posit that every statement about the real world is bottomed on hearsay. It can be argued that one directly perceives nothing but mental imprints. Thus, all knowledge about an empirical fact is simply an opinion. As is manifest, any rule creating a normative straitjacket by treating all hearsay as presumptively inadmissible would be epistemological hara-kiri. However, there is good reason to be concerned about out-of-court statements.

digm. *See Ashford,* 147 Md.App. at 73–74, 807 A.2d 732. But this problem is easily unscrambled.

We begin by accepting the trial court's ruling that Dante's statement constituted an excited utterance embraced by Rule 5–803(b)(2). But its admissibility lies not with the secondary hearsay (Dante's exclamation to Eva Coleman) but with the primary hearsay that came after Detective Jones's recitation of Ms. Coleman's assertion of her deceased son's words: "I just ran into someone I don't need to see."

■ Statements made to an investigating officer are not hearsay unless and until they are offered into evidence for their truth. *Daniel v. State,* 132 Md.App. 576, 589, 753 A.2d 545, *cert. denied,* 361 Md. 232, 760 A.2d 1106 (2000).[10]

The State begrudgingly concedes that Detective Jones's "testimony does appear to have been [hearsay]." The testimony is glaringly hearsay. Ms. Coleman's remarks were offered, through Detective Jones, pellucidly for their substance and effect: to show that Dante was being "pursued by someone." Indeed, appellant's objection to the introduction of the hearsay is framed as a challenge to what it implies—Dante Brown did not take care of his drug debt—and not what it portrays— Dante was scared. Thus, this out-of-court assertion was hearsay.

This, however, is not dispositive of the issue. We must now determine whether any prejudice requires a new trial.

### Harmless Error

■ Appellant correctly asserts that the introduction of Ms. Coleman's statement through Detective Jones's testimony was error. We are nevertheless satisfied that the admission of

10. Indeed, such reports are routinely used for a variety of reasons other than as substantive evidence. *Id. See Ashford,* 147 Md.App. at 75–76, 807 A.2d 732 (citing cases and providing examples of non-hearsay statements to investigators). *See generally, Julian v. Randazzo,* 380 Mass. 391, 394, 403 N.E.2d 931 (1980) (discussing police reports and "second level" or "totem pole" hearsay).

this hearsay was harmless beyond a reasonable doubt.[11] Given the extant record, we conclude on a number of grounds that the trial court's lapse in giving such free rein to Detective Jones on the stand "could not possibly have influenced the verdicts." *See Borchardt,* 367 Md. at 131, 786 A.2d 631 (citing *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976)). *See also Farewell v. State,* 150 Md.App. 540, 579 n. 17, 822 A.2d 513 (2003).

First, the disputed statement, that Dante had just run into someone he wanted to avoid, is fairly innocuous by itself. We do not see this statement, taken alone, as necessarily indicating a more "compelling motive" for the murders than the fact that Dante may have insulted appellant's mother—the reason he gave to Rene Knight and Bianca Young—a fact which, on the streets, may be a compelling reason for exacting revenge.

In addition, appellant must hurdle the prospect of waiver by failing to object to appellant's two separate admissions, in his statement that was read into evidence, that he had been arrested on a CDS charge. *See Williams v. State,* 131 Md.App. 1, 26–27, 748 A.2d 1, *cert. denied,* 359 Md. 335, 753 A.2d 1032 (2000).[12] Although appellant complains of the "double hearsay" in the form of Detective Jones's testimony, he

---

**11.** We need not belabor at this point the appropriate standard of review of a trial court's admission of hearsay. *See, e.g., Stalbosky v. Belew,* 205 F.3d 890, 894 (6th Cir.2000) (court typically reviews evidentiary rulings under an abuse of discretion standard but applies *de novo* review of conclusion whether proffered evidence is inadmissible hearsay) (quoting *United States v. Latouf,* 132 F.3d 320, 329 (6th Cir.1997)). Whether the admission of the hearsay was an error that we would review *de novo, cf. State v. Walker,* 345 Md. 293, 325, 691 A.2d 1341 (1997) (*de novo* review of admission under Rule 5–804(b)(5) residual exception), or an abuse of discretion, we must still ascertain whether appellant suffered prejudice.

**12.** In *Williams v. State,* 131 Md.App. 1, 748 A.2d 1, *cert. denied,* 359 Md. 335, 753 A.2d 1032 (2000), Judge Moylan pointed out that "[w]hen evidence is received without objection, a defendant may not complain about the same evidence coming in on another occasion even over a then timely objection." *Id.* at 26–28, 748 A.2d 1 (citing cases). *See also Wallace v. State,* 63 Md.App. 399, 409, 492 A.2d 970, *cert. denied,* 304 Md. 301, 498 A.2d 1186 (1985).

does not contest on appeal the admission of Eva Coleman's testimony, which highlighted her concerns that Dante had a drug problem, that he had paid one person, "Little Glenn," money for drugs, and that he left the house with more money. On cross-examination of Ms. Coleman, defense counsel specifically raised the issue of drug debts by suggesting that because Dante was a drug user, "he would have debts to drug dealers[.]" Ms. Coleman's testimony, both on direct and on cross-examination, effectively conveys the same message as her hearsay statement, admitted through Detective Jones, to the effect that she was afraid that Dante would be harmed by "[p]ersons to whom he had owed money to for drug debts." [13]

Alternatively, we conclude that, without Brown's statement, the State presented a compelling case. The admissions by appellant to Rene Knight and Bianca Young provide sufficient evidence of guilt that would have permitted the jury to convict. Their statements are in turn underpinned by the fact that police recovered one of the murder weapons from a room to which appellant had access in his house. Appellant's statement, read into the transcript at trial, reveals that he was able to tell Pierre Easter the location of this handgun, and allowed his friend to take it in order to use it.

We conclude that, based on our independent review of the record as a whole and convinced beyond a reasonable doubt, "there is no reasonable possibility that the [hearsay evidence

---

**13.** While we have indulged appellant on the preservation issue by entertaining his challenge generally to the recitation of Detective Jones's interview with Eva Coleman, we note in passing that at trial the defense made no specific hearsay objection to testimony that one source of Eva Coleman's concern was that Dante would be harmed by "[p]ersons whom he owed money to for drug debts."

Only following the next answer did the defense object, and then only citing the State's questioning as "leading." The trial court sustained the objection. "It is well-settled that when specific grounds are given at trial for an objection, the party objecting will be held to those grounds and ordinarily waives any grounds not specified that are later raised on appeal." *Klauenberg v. State*, 355 Md. 528, 541, 735 A.2d 1061 (1999). Nevertheless, we need not base our determination of harmless error on the fact that the defense may well have let the "drug debts" testimony in without objection.

admitted in error] may have contributed to the rendition of the guilty verdict." *Dorsey,* 276 Md. at 659, 350 A.2d 665.

## II. Instructions and Inconsistent Verdicts

Citing instructional error, appellant contests his conviction for conspiracy to commit murder. The trial court instructed the jury:

> The Defendant has also been charged with conspiracy to commit murder. Conspiracy is an agreement between two or more persons to commit a crime. In order to convict this Defendant of conspiracy, the State must prove that the Defendant entered into an agreement with at least one other person to commit the crime of murder and that the Defendant entered into the agreement with the intent that the murder be committed.

This instruction roughly tracks the language of the *Maryland Criminal Jury Instructions.*[14]

Appellant's attack is two-pronged. In his first prong, he deprecates the trial court's instruction because it does not set forth the "required elements of premeditation, deliberation, and a specific intent to kill[.]" In his second prong, he argues that the prejudice from this incorrect charge is clear because in its confusion the jury rendered inconsistent verdicts— acquitting him of first degree murder of both victims and clearing him of using a handgun in the commission of a felony. Appellant then concludes that, because the trial judge failed to instruct on the requisite mental state for first degree murder, "the jury may well have believed that it could convict [him] of

---

**14.** *Maryland Criminal Pattern Jury Instruction,* MPCJI 4:08, provides:
The defendant[s] is [are] charged with the crime of conspiracy to commit [ ]. Conspiracy is an agreement between two or more persons to commit a crime. In order to convict the defendant of conspiracy, the State must prove:
(1) that the defendant[s] entered into an agreement with at least one other person to commit the crime of [ ]; and
(2) that the defendant[s] entered into the agreement with the intent that [ ] be committed.

conspiring to commit an unplanned and unpremeditated murder."

The State urges that we affirm. The State first interposes a preservation argument, pointing out that the defense failed to challenge the jury instructions at trial. The government then proclaims that the guilty verdicts on conspiracy to commit first degree murder and murder in the second degree are not necessarily inconsistent with acquittals on the first degree murder and handgun counts. Finally, the State, humoring appellant's assignment of error, avers in any event that we should not disturb the verdicts rendered on the basis of their inconsistency.

## Preservation

We can speedily dispose of the State's non-preservation argument. As Judge Davis has noted:

> The State suggests that defense counsel's failure to object to the court's instructions or to request an instruction on consistent verdicts precludes Beharry from complaining on appeal about the inconsistent verdicts. *See* Md. Rule 4–325(e). We do not agree. As we explained in *Jenkins v. State,* 59 Md.App. 612, 620–21, 477 A.2d 791 (1984), *modified on other grounds,* 307 Md. 501, 515 A.2d 465 (1986) (regarding whether guilty verdicts of assault with intent to murder and assault with intent to maim were inconsistent):
>
> > Ordinarily, a defendant's failure to make a timely objection to the court's instructions, or to its omission to give an instruction, precludes appellate review of any error relating to the instructions.... Where the error arises from the rendition of inconsistent verdicts, however, although it could have been avoided by appropriate instruction, it extends beyond the matter of instructions.

\* \* \*

We further explained in *Jenkins* that, *when real prejudice is shown, we will review on appeal an argument that*

*verdicts were fatally inconsistent even if the defendant failed to make the argument below.*

*Stuckey v. State,* 141 Md.App. 143, 157 n. 3, 784 A.2d 652 (2001) (quoting *Bates and Beharry v. State,* 127 Md.App. 678, 699–700, 736 A.2d 407 (1999)) (emphasis in original), *cert. denied,* 368 Md. 241, 792 A.2d 1178 (2002). Because appellant embroils the conspiracy instruction in the rendering of the inconsistent verdicts, each of the prongs of his argument merits further probing.

### First Prong

### Inconsistent Verdicts

At common law, jurors took an oath to well and truly try the case, and their verdict was considered sacrosanct. Since trial by jury developed as an alternative to the ancient methods of compurgation and ordeal, the jury was to be considered no more "rational" than the ordeals the jury had replaced. Just as one did not question the judgments of God in the ordeal, one did not challenge the jury's verdict. Consistency has never been a requisite attribute of a jury verdict. Continuing the common law tradition, "[i]nconsistent verdicts in a jury trial [ ] are generally tolerated under Maryland law." *Stuckey,* 141 Md.App. at 157, 784 A.2d 652 (footnote omitted). Much like Macbeth confronted with the witches' prediction that no man of woman born would ever be a threat for him, to reverse an inconsistent conviction would not only require guesswork about what produced the inconsistency, but would also be unfair to the State, which cannot appeal an inconsistent acquittal. At the trial level, if a jury returns a verdict that is inconsistent on its face, the trial judge might respond by refusing to accept the verdict, pointing out to the jury how the verdict cannot be reconciled with the jury instructions, and sending the jury back for further deliberations to resolve the inconsistency. The judge might also instruct the jurors that, to the extent that their verdict reflects a compromise reached by abandoning the reasonable doubt standard, such a compromise is impermissible. Deliberations would then continue

until jurors either returned a consistent verdict or indicated to the court's satisfaction that they were hopelessly deadlocked.

 At the appellate level, the court will review such verdicts where real prejudice is shown and the verdicts may be attributable to errors in the jury charge. *See id.* at 157 n. 3, 784 A.2d 652 (quoting *Bates v. State,* 127 Md.App. 678, 699–700, 736 A.2d 407 (1999)).

Although the Supreme Court concedes that inconsistent verdicts reveal jury error, nevertheless in *United States v. Powell,* 469 U.S. 57, 67, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), speaking for an unanimous Court on inconsistent jury verdicts, Chief Justice Rehnquist, with an apparent shrug of the shoulders, stated:

> Finally, we note that a criminal defendant already is afford-. ed protection against jury irrationality or error by the *independent review of the sufficiency of the evidence undertaken by the trial and appellate courts.* This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. . . . This review should be independent of the jury's determination that evidence on another count was insufficient. The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilty beyond a reasonable doubt. We do not believe that further safeguards against jury irrationality are necessary.

(Citations omitted; emphasis supplied.) *See also Galloway v. State,* 371 Md. 379, 809 A.2d 653 (2002) (Jury acquitted defendant of the charge that defendant had possessed and used a handgun. The jury's verdict notwithstanding, the trial court convicted defendant on both counts of possession of a firearm after having been previously convicted of a crime. The trial court's judgment in the same case was inconsistent with and impermissibly negated the jury's verdict.); *State v. Johnson,* 367 Md. 418, 788 A.2d 628 (2002) (All co-defendants

were acquitted of conspiracy to commit murder, for which defendant was subsequently convicted in a separate trial. The "rule of consistency" did not apply to verdicts issued in separate trials.); *Shell v. State*, 307 Md. 46, 512 A.2d 358 (1986) (The court reversed the jury conviction of the use of a handgun in the commission of a felony after he had been acquitted by the trial judge of the underlying felony or crime of violence.). The *Johnson* and *Shell* cases distinguish between inconsistent verdicts in a jury trial and such verdicts in a non-jury trial.

Appellant confuses a curious verdict with an inconsistent verdict. As indicated in *Powell, supra,* a truly inconsistent verdict reveals a definite error but conceals the error's victim. Whose ox has been gored? The defendant's? The government's?

■■■ First, there is no inconsistency either between the acquittal on the first degree premeditated murder count and the conviction for conspiring to commit first degree murder or, obversely, an acquittal on a conspiracy charge and the conviction of first degree murder. These offenses are separate and distinct. The crime of conspiracy is proven by "a meeting of the minds reflecting a unity of purpose and design[.]" *Monoker v. State*, 321 Md. 214, 221, 582 A.2d 525 (1990).

■■■ It is not necessary that the target offense be made out at all. An inchoate crime, such as that expansive definition of solicitation conspiracy, requires that the defendant must have the purpose to engage in future forbidden conduct, that is, contemplate a crime that has not yet occurred. Similar to other inchoate crimes, conspiracy punishes preparatory conduct before it develops into a substantive offense. A conspiracy is distinct from the substantive crime contemplated by the conspiracy and is charged as a separate offense. The *actus reus* of conspiracy is an agreement to commit a crime. "The crime is complete without any overt act." *Gardner v. State*, 286 Md. 520, 524, 408 A.2d 1317 (1979). The jury was free to convict appellant on the premeditated murder count, acquit him altogether, or find, as it apparently did, that, when

the time came to execute the plan, appellant's conduct may not have satisfied the requirements for first degree, premeditated murder, because the evidence only convinced them, beyond a reasonable doubt, of a lesser degree of homicide.

We find no inconsistency in the verdicts.

## Second Prong

## Conspiracy Instruction

Were we, however, to find such an inconsistency, we nonetheless disagree with appellant's contention that the instruction was in error.

We realize that the Pattern Jury Instructions do not necessarily cover every conceivable situation, and they cannot be followed without consideration of the particular circumstances of each case. Nevertheless, we noted in *Green v. State,* 119 Md.App. 547, 562, 705 A.2d 133 (1998), that "... appellate courts have chastised trial judges for deviating from the model burden of proof instructions."

Although the better course was for the trial court to instruct the jury using more explicit elements of the offense, *see Mitchell v. State,* 363 Md. 130, 146, 767 A.2d 844 (2001), we nonetheless see no reason to upset the conspiracy verdict on the basis of the jury charge actually given. This is so because, following Judge McAuliffe's admonition "... that any departure from that language will be "subjected to careful scrutiny[,]" *Wills v. State,* 329 Md. 370, 392, 620 A.2d 295 (1993), we have viewed the instructions in their entirety, *see Fleming v. State,* 373 Md. 426, 433, 818 A.2d 1117 (2003), and "it is [not] apparent from the record that the jury was misled by the court's instructions. Any inconsistent verdicts clearly are not a product of lenity, mistake, or compromise on the part of the jury[.]" *Bates,* 127 Md.App. at 694, 736 A.2d 407. The trial court instructed the jury, *inter alia,* that it had to find that appellant "entered into the agreement with the intent that the murder be committed."

We examine the appellant's inchoate criminality through the prism of purpose. When a defendant engages in proscribed conduct or in conduct that brings about a prohibited result, our interest focuses on his state of mind at the time he engages in the proscribed conduct or the conduct that causes the result.

Despite the conditionality of a defendant's criminal purpose, when a defendant commits an inchoate crime, such as conspiracy, the defendant usually has shown himself or herself to have a less than totally praiseworthy character and to hold out some threat to the rights of others protected by the criminal law. Ordinarily, however, neither a reprobate character nor the hazard it represents suffices for criminal liability. What differentiates the inchoate criminal from others who are reprobate and hazardous is that the former has formed a criminal intention.

Generally, all crimes contain a *mens rea* or mental state element. In all of the traditional crimes, there must exist a prohibited action or result (*"actus reus"*) and a certain mental state (*"mens rea"*). For example, crimes require that there be awareness that the prohibited action will occur (*mens rea*) at the time of the commission of the prohibited action. Thus, in the present case for there to be first degree murder it is not enough that appellant killed another human. The killing must have been willful, deliberate, and premeditated.

Appellant argues that, because the trial court previously instructed on both first and second degree murder, it failed to advise the jury in its conspiracy instruction that there can be no conspiracy to commit second-degree murder, and to convict the appellant of conspiracy to murder the jury must find an agreement to commit willful, deliberate, and premeditated murder. *Mitchell,* 363 Md. at 149, 767 A.2d 844.

Conspiracy has two mental states: one for the underlying crime itself, and one for any result or action that is necessary to accomplish that goal. As was recently observed by the Court of Appeals:

When the object of the conspiracy is the commission of another crime, as in conspiracy to commit murder, the specific intent required for the conspiracy is not only the intent required for the agreement but also, pursuant to that agreement, the intent to assist in some way in causing that crime to be committed. . . . Thus, if the conspiracy is to commit murder, the intent must be to commit (or have someone commit) those acts that would constitute murder.

*In re Heather B.*, 369 Md. 257, 271, 799 A.2d 397 (2002) (quoting *Mitchell*, 363 Md. at 146, 767 A.2d 844).

Given the symmetry between the *mens rea* required for premeditated first degree murder and conspiracy to commit murder, we are satisfied that the trial court adequately instructed the jury, and that appellant's conviction for conspiracy to commit first degree murder was not the product of an instruction that would allow the jury to convict on the basis of a lesser degree of intent. *See Mitchell*, 363 Md. at 149, 767 A.2d 844 (". . . the kind of awareness and reflection necessary to achieve the unity of purpose and design for a conspiracy is essentially the same as that required for deliberation and premeditation.").[15]

### III. Mistrial

We turn to appellant's contention that the trial court abused its discretion in denying the defense motion for a mistrial because of inadvertent admission of "other crimes" evidence. The defense sought this remedy, asserting that it was aggrieved by testimony of an acquaintance of appellant, Shawn Horton, whose statements on two occasions during his examination suggested appellant's involvement in the narcotics trade.

Appellant insists that, despite curative instructions from the trial judge, "two [separate] references to [him] as being in the business of selling drugs" could only have alerted the jury to a

---

15. The jury got the message. It had the option to convict on conspiracy to commit second degree murder, having been instructed on both the "target" offenses, and, in our view, explicitly rejected it.

propensity for criminal activity and violence. We disagree, and see no abuse of discretion in the trial judge's denial of appellant's motion for a mistrial.

Shawn Horton testified for the State. Both appellant and Easter were his friends. The testimony proceeded as follows after the prosecution inquired whether Horton knew someone going by the name of "Clarence," one of the victims in this case:

[PROSECUTOR]: And who was Clarence?

[WITNESS]: A regular customer.

The defense counsel immediately objected. The trial court then directed that Horton's response would be stricken, and instructed the jury:

Ladies and gentlemen, Mr. Horton stated in his law [sic] few words a response to the last question. In his answer, he referred to Clarence as a "regular customer." Please disregard that, strike it from your memory. Don't consider it in your deliberations or in your consideration of the verdict sheet in this case.

Is that satisfactory?

[DEFENSE]: Thank you, Your Honor.

Later, Horton testified that appellant and Easter had been robbed. The prosecutor had asked Horton about some of the events that occurred the day of the shooting:

[PROSECUTOR]: What happened during the day, can you tell us?

[WITNESS]: We got robbed during that day.

[PROSECUTOR]: Who got robbed.

[WITNESS]: Pierre, Gerard.

\* \* \*

[PROSECUTOR]: With regard to Gerard, what, if any-thing, did he say?

[WITNESS]: What did he say?

[PROSECUTOR]: Um-hum, to you.

[WITNESS]: He just got robbed.

[PROSECUTOR]: And what did you say?

[WITNESS]: Fuck it. We chalk it up as a loss.

[PROSECUTOR]: All right, and then what happened?

[DEFENSE]: Objection, Your Honor.

THE COURT: Excuse me. Overruled.

[PROSECUTOR]: And then what happened?

\* \* \*

[DEFENSE]: Your Honor, may we be heard?

THE COURT: Come on back up.

\* \* \*

THE COURT: I know it looks like somebody's in business but go ahead, why don't you put your objection—

[DEFENSE]: Your Honor, my objection is that the witness said we chalk it up as a loss which it clearly implies that they're in business together.

Your Honor, I have to ask for a mistrial at this point.

\* \* \*

Because we've agreed—and it's not the State's Attorney's fault, I understand that. But this certainly implies drug dealing, which would be a prior bad act that is not admissible in this case. It is going to be impossible for the jury to disregard that statement in conjunction with the other statement, and the implications for them being out on the corner all day long. For them to disregard that and not to consider my client a drug dealer, which is not the issue in this case. I don't think, as a result of that, he can get a fair trial from this jury. And for that reason, I'd ask for a mistrial.

\* \* \*

That's in conjunction with the prior testimony that Mr. Miller was a customer.

THE COURT: Customer—

[DEFENSE]: And the State's Attorney's correct, I didn't make a motion, because we did have an agreement. And I'm not accusing her of violating the agreement, but if the Court wants I'll make a motion and we can have a hearing on it.

THE COURT: I want to protect your-deny the motion for a mistrial. I don't think you're quite there but it's awfully close.

\* \* \*

THE COURT: Ladies and gentlemen, let me grant the objection—sustain the objection and let the—ask you to put out of your mind the answer to the last question, which was just chalk it up as a loss. Please don't consider this in your deliberations.

Horton later testified on cross-examination that he did not know Dante Brown or Ms. Lee.[16]

### Standard of Review

In *Carter v. State*, 366 Md. 574, 785 A.2d 348 (2001), the Court of Appeals articulated the standard for appellate review of a trial court's decision on a motion for a mistrial:

It is well-settled that a decision to grant a mistrial lies within the sound discretion of the trial judge and that the trial judge's determination will not be disturbed on appeal unless there is abuse of discretion. *See Klauenberg v. State*, 355 Md. 528, 555, 735 A.2d 1061, 1075 (1999); *State v. Hawkins*, 326 Md. 270, 277, 604 A.2d 489, 493 (1992); *Hunt v. State*, 321 Md. 387, 422, 583 A.2d 218, 235 (1990). We have held consistently to the principle that "[t]he grant of a mistrial is considered an extraordinary remedy and should be granted only 'if necessary to serve the ends of justice.'"

---

**16.** Curiously, following the logic of appellant's argument, Horton's denial that he knew Dante Brown would suggest that Brown, purportedly the first target of the shooting because he was approached directly, was not a "regular customer."

*Klauenberg,* 355 Md. at 555, 735 A.2d at 1075 (citations omitted). The question, as we have often said, is one of prejudice to the defendant. *See, e.g., Rainville v. State,* 328 Md. 398, 408, 614 A.2d 949, 953 (1992).

*Id.* at 589, 785 A.2d 348.

Certainly, the trial judge is in the best position to gauge whether the circumstances dictate that a motion for a mistrial should be granted. *Miles v. State,* 365 Md. 488, 570, 781 A.2d 787 (2001). "[W]hen the court finds that inadmissible evidence has been presented to the jury, it is within the discretion of the trial court to decide whether a cautionary or limiting instruction should be given." *Carter,* 366 Md. at 588, 785 A.2d 348.

We conclude that the trial judge acted within his discretion in instructing the jury following the unsolicited comments from Shawn Horton, and that the instructions were sufficient to mitigate the effect of any inference that would be drawn from Horton's oblique references to the drug trade. Accordingly, we uphold the trial court's denials of appellant's requests for a mistrial, because we are satisfied that the curative instructions provided here mitigated any prejudice that would have accrued to appellant because of Horton's inadvertent remarks.

Finally, appellant's appeal on this issue faces additional, and now familiar, hurdles: the introduction, not contested on appeal, of Ms. Coleman's testimony about Dante's drug problems, and her concern because he was going back to the streets that day with more money, her affirmative response to questioning on cross-examination that Dante "would have debts to drug dealers," and appellant's admissions to a CDS arrest. *See Williams v. State, supra.* At the end of the day, whether one considers appellant's argument to have been foreclosed, or any prejudice rendered harmless, *see id.,* appellant has failed to justify a reversal on this basis.

## IV. Sufficiency

Appellant maintains that the evidence of record is insufficient to support his convictions for conspiracy and second

degree murder. We differ with appellant in our view of the record.

## Standard of Review

Our review of the sufficiency of the evidence is plenary. In reviewing for sufficiency, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *accord State v. Smith*, 374 Md. 527, 533, 823 A.2d 664 (2003); *Wiggins v. State*, 324 Md. 551, 567, 597 A.2d 1359, *cert. denied*, 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992); *Johnson v. State*, 142 Md.App. 172, 193, 788 A.2d 678, *cert. denied*, 369 Md. 180, 798 A.2d 552 (2002); *Jones v. State*, 138 Md.App. 12, 17, 769 A.2d 1015, *cert. denied*, 364 Md. 535, 774 A.2d 409 (2001).

In conducting this review, our role is not to retry this case, because " '[j]udging the weight of evidence and the credibility of witnesses and resolving conflicts in the evidence are matters entrusted to the sound discretion of the trier of fact.' " *In re Heather B.*, 369 Md. 257, 270, 799 A.2d 397 (2002) (quoting *In re Timothy F.*, 343 Md. 371, 379–80, 681 A.2d 501 (1996)), because it is the exclusive function of the jury to draw reasonable inferences from proven facts. *Diaz v. State*, 129 Md.App. 51, 70, 740 A.2d 81 (1999), *cert. denied*, 357 Md. 482, 745 A.2d 436 (2000). Rather, we "determine whether the verdict was supported by sufficient evidence, direct or circumstantial, which could convince a rational trier of fact of the defendant's guilt of the offenses charged[.]" *White v. State*, 363 Md. 150, 162, 767 A.2d 855 (2001).

## Conspiracy

Appellant, contesting his convictions for common law conspiracy and second degree murder, denigrates the evidence as insufficient to support a finding of guilt on either count. He maintains that the State failed to show any agreement between himself and Pierre Easter to accomplish the homicides,

and avers that the evidence, circumstantial at best, "supports a reasonable hypothesis of innocence of conspiracy (an impulsive act)[.]"

As we have previously discussed, the State need only prove "a meeting of the minds reflecting a unity of purpose and design[.]" *Monoker, supra,* 321 Md. at 221, 582 A.2d 525.

There is considerable evidence to support the jury's verdict of conspiracy. Appellant told Rene Knight that two people were shot at Ashburton and North, that he had shot one and Pierre the other. Knight recounted that appellant had asserted that the victims had "disrespected" his mother, and Pierre's grandmother, "so [appellant] dealt with the person who . . . disrespected his mother and Pierre dealt with the person who disrespected his grandmother." On further examination, Knight testified that appellant said that "[t]hey would deal with it themselves." Appellant told Knight that "he waited till it got dark and he lay for the person who disrespected his mother and he shot him on North and Ashburton." Ms. Knight further recounted that appellant then said that "Pierre was with him." Appellant admitted in his March 10, 2000, statement that he showed Pierre where one of the murder weapons was located, and Pierre took it, after telling appellant why he wanted the weapon. Judged in the light most favorable to the verdict, we conclude that the "the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence" as to conspiracy. *See Wilson v. State,* 319 Md. 530, 537, 573 A.2d 831 (1990).

The evidence for second degree murder is even more compelling. The cornerstone of the State's case is appellant's admissions to Rene Knight and Bianca Young that he shot a man. Ms. Knight's testimony was particularly unassailable. She had no motive to implicate appellant, and, indeed, had been a neighbor and was friendly with appellant's sister. On cross-examination, she was direct and forthright:

[DEFENSE]: So you're saying he just walked straight up into the apartment and then went into—

[WITNESS]: He came to ask me if I heard about what happened on the night—on December 30th. I, in turn, told him no. He, in turn, asked me if I had told anybody anything, and I, in turn, told him no. And the conversation went from there.

One of the murder weapons, the .32 caliber revolver, found its way back to appellant's house. Bianca Young, who was appellant's third cousin and, on this record, was likewise not shown to have a motive to lie, also testified to appellant's admission. Both Rene Knight and Bianca Young saw the weapon, proven to be the .32 caliber revolver used in the killings.

In the final analysis, this testimony transcends mere sufficiency, and offers compelling proof that permitted the jury to return verdicts of guilty.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**